STATE OF NEBRASKA, APPELLEE, V. ALISHA J. OWEN, APPELLANT.

510 N.W.2d 503

Filed August 3, 1993.    No. A-91-836.

John W. DeCamp, of DeCamp Legal Services, P.C., for appellant.

Don Stenberg, Attorney General, and Delores Coe-Barbee for appellee.

CONNOLLY, MILLER-LERMAN, and WRIGHT, Judges.

CONNOLLY, Judge.

This appeal arises from the conviction of the appellant, Alisha J. Owen, on eight counts of perjury under Neb. Rev. Stat. § 28-915 (Reissue 1989). Owen assigns 24 errors. We affirm on all errors properly raised on appeal except those

dealing with alleged misconduct by the jury during deliberation and alleged improper communication between the judge and jury during deliberation. We vacate the trial court's order overruling Owen's motion for new trial and remand this cause with directions to the district court to conduct an evidentiary hearing on the allegations concerning jury misconduct and improper communication between the judge and jury.

## I. FACTS

The trial of Owen lasted 5 weeks. The record contains over 4,000 pages of trial testimony and 182 exhibits, including approximately 11 hours of videotaped testimony. Included in the exhibits are more than 1,000 pages of testimony from a previous grand jury proceeding related to Owen's perjury trial. Having reviewed the foregoing, we present a summary of the facts relevant to the issues raised on appeal.

### 1. GRAND JURY INDICTMENT

This case developed out of the original investigation of the financial collapse of the Franklin Community Credit Union (Franklin) in Omaha, Douglas County, Nebraska. A federal grand jury and the National Credit Union Association investigated in detail the financial misdeeds that caused the credit union to fail. During the investigation of Franklin's financial collapse, allegations surfaced in which adults with connections to the credit union were accused of child sexual abuse. The gist of the allegations was that Larry King, Jr., former head of the credit union, had thrown a series of parties at which minors were sexually abused.

A Douglas County grand jury was impaneled March 19, 1990, to examine alleged illegal activities of the credit union's members, officers, employees, and benefactors. The county grand jury focused its attention on the sexual abuse allegations. Financial abuses concerning the credit union were considered only to the extent that they offered possible leads to dealings involving drugs, pornography, and illicit sexual activity.

The most controversial evidence examined by the grand jury consisted of videotaped statements and live grand jury testimony by the appellant, Owen, and three other youths, Paul Bonacci, Troy Boner, and James "Danny" King, who claimed

they had been sexually molested by adults involved in an ongoing scheme of child sexual exploitation. The videotapes had been made in connection with a separate Franklin investigation undertaken by the Nebraska Legislature.

In testimony before the grand jury, Boner and Danny King recanted their videotaped statements. They told the grand jury that the entire chain of allegations was false. The grand jury found that Boner and Danny King had followed Owen's lead in making the videotapes and participating in the scam because they had believed, as had Owen, that the ruse would eventually lead to lucrative book, television, and movie contracts. Furthermore, at the time the videotapes were made, Owen was serving a prison sentence for having passed bad checks. The grand jury determined that Owen had hoped that by stirring up a controversy and then cooperating with authorities in the investigation of the alleged child sexual abuse ring, she could obtain a reduced prison sentence or improved living conditions.

Even absent the recantations of Boner and Danny King, the grand jury found that the allegations of all four youths were lacking in credibility. The grand jury found that the "story of sexual abuse, drugs, prostitution, and judicial bribery presented in the legislative videotapes [was] a carefully crafted hoax, scripted by a person or persons with considerable knowledge of the people and institutions of Omaha." Owen and Bonacci, the two youths who stood by their videotaped statements alleging sexual exploitation, were indicted for perjury.

## 2. Background on Owen

### (a) The Casey Connection

The State argued that Owen's story of Franklin-related child sexual abuse began to take shape when she met Michael Casey in the fall of 1988.

Owen was arrested in September 1988 for having issued bad checks. She was detained for several days and then released pending disposition of her case. On October 20, Owen checked herself into the St. Joseph Center for Mental Health for psychiatric evaluation and remained there until November 30. Within days of her release, Owen attempted suicide. She was

hospitalized again at St. Joseph's from December 5 to 16.

While at St. Joseph's, Owen became acquainted with Casey, whom the grand jury described as a "con man" passing himself off as an investigative reporter who "endeavored to uncover the 'real' Franklin story." Shortly after Owen was released from St. Joseph's in December, Casey contacted her about moving in with him and his male roommate. Casey said that he was an investigative reporter for the New York Times and that he would train Owen to be his assistant. In a February 1990 interview, Owen told FBI special agent Michael Mott that during the 2 to 3 weeks she stayed with Casey, he pumped her for Franklin-related information. She told Mott that she had stonewalled Casey, telling him that she was not involved in the scandal herself. However, in a letter to Owen dated March 15, 1990, and found among Owen's personal papers, Casey wrote that he was working with producers in Los Angeles and Omaha to develop his "Franklin project" and that he would send Owen a copy of the first draft of a script for a play so that Owen could review it and offer her ideas. In a greeting card to Owen dated March 23, 1990, and found among Owen's personal papers, Casey wrote that three national publications and a movie producer were interested in his Franklin project and that Owen was "assured of a job when [you] get out of their [sic] as a consultant and researcher."

At trial, Bill Gehrig, a friend of Owen who had visited her during her stay at St. Joseph's, testified that Owen had told him in January 1990 that she had been working with Casey on an investigative report on the Franklin collapse and that she was involved in the stories of abuse that were beginning to surface in the public media at that time. Owen testified that Gehrig was mistaken; she denied ever representing herself as an investigative assistant to Casey on a Franklin probe.

On October 30, 1989, while Owen was serving her prison sentence for a bad check conviction at the Nebraska Center for Women in York, she was contacted by Gary Caradori, a private investigator. Caradori was conducting an investigation for a special committee of the Nebraska Legislature created specifically to investigate Franklin-related allegations of child sexual abuse. Owen said Caradori had told her that he had

found her by picking up the name Alisha "off of the streets" and then running the name through a police computer. However, the March 15, 1990, letter to Owen from Casey included the following excerpt:

> I also know and feel that promises were made — *before I ever gave Gary you[r] name and location* — he'd assured me that if your info checked out you would receive favorable consideration and protection outside of a prison environment. I feel most responsible if promises were made to you and not kept!

(Emphasis supplied.)

### (b) Owen Comes Forth with Allegations

Owen testified that Caradori had shocked her when he informed her at their initial meeting at the Nebraska Center for Women in York on October 30, 1989, that her name had come up more than once in the course of his investigation, particularly among people who knew Larry King. Initially, Owen refused to cooperate with Caradori. She subsequently changed her mind and mentioned that she knew Larry King and other people linked to the child sexual abuse accusations. Owen balked when Caradori said he wanted her to make a formal statement. That concluded the October 30 meeting.

Eventually, Owen decided to tell Caradori her whole story. Caradori returned to the Center for Women around November 7 and began the interviewing process that would yield three videotaped statements by Owen detailing the sexual abuse she allegedly had suffered at the hands of adults connected with Larry King.

On December 15, 1989, in response to a directive from the Attorney General's office, the Nebraska State Patrol interviewed Owen about her Franklin-related allegations. In February and April 1990, the FBI conducted a series of interviews with Owen on the Franklin scandal. Owen was not forced to participate in any of these interviews. Investigators for both law enforcement agencies testified that it was made clear to Owen that she was being interviewed as a victim and a witness, not interrogated as a suspect. The accounts of sexual exploitation that Owen described to the State Patrol and the

FBI were generally consistent with the allegations she had made for Caradori on videotape.

In live testimony before the Douglas County grand jury, Owen reasserted the allegations that she had made on videotape for Caradori and in her interviews with the State Patrol and the FBI. The grand jury determined that Owen was lying. At the conclusion of its proceedings on July 23, 1990, the grand jury handed down an indictment charging Owen with eight counts of perjury pursuant to § 28-915, which provides that a "person is guilty of perjury . . . if in any official proceeding he or she makes a false statement under oath . . . or affirms the truth of a statement previously made, when the statement is material and he or she does not believe it to be true."

### 3. PRETRIAL PROCEDURAL HISTORY

The indictment was filed in district court July 24, 1990. At her August 8 arraignment, Owen pled not guilty. On April 18, 1991, the district court issued an order in which it found that there had been adequate time for discovery. Consequently, the court ordered that all pretrial motions be filed on or before Monday, April 29, as a trial date was set for May 20.

Over the 2 days of Tuesday, April 30, and Wednesday, May 1, defense counsel filed 1 motion to quash, 1 motion for a discovery order, 2 motions in limine, 2 motions to suppress, and 10 motions to dismiss. The court denied hearings on all the motions on grounds that they had been filed out of time. Defense counsel disputed the finding that the motions had been filed out of time. He argued that the court had given him permission to file motions out of time as long as the prosecutor was notified of the late filings. The judge disagreed with defense counsel and rejected the assertion that mere notice of late filings was sufficient. The judge insisted that he had given defense counsel permission to file motions after April 29 only if the agreement of the prosecutor had been secured in advance. The record indicates that defense counsel did not inform the prosecutor of the late filings until after the motions had been filed.

Meanwhile, the State had filed a timely motion asking the court to make a pretrial finding that the statements given by

Owen to the State Patrol and the FBI between December 15, 1989, and April 10, 1990, had been made voluntarily. The hearing on the motion fills the first 496 pages of the bill of exceptions. Despite the time devoted to the issue, we are unable to find in the record a ruling on the motion by the trial judge. However, it is clear from the record that the parties proceeded at trial as if the motion had been granted and the judge had found that Owen's statements to the law enforcement agencies had been made voluntarily.

Immediately before the start of testimony at trial, with the jury impaneled and sworn but not yet in the jury box, defense counsel moved for a mistrial on grounds that Owen's constitutional right to a fair trial had been violated in the course of jury selection. Defense counsel claimed that the State had violated Owen's right to a fair trial by using six of its seven peremptory challenges to excuse females. The motion was overruled, and the jury trial was commenced.

#### 4. TRIAL

We now review the evidence adduced at trial pertaining to each of the individual charges.

### (a) Count I

#### (i) Alleged Perjury

In substance, Owen testified to the grand jury that she was certain that she had first met Troy Boner and Danny King in August 1983 at a party hosted by Larry King at the Twin Towers, an apartment complex at 30th and Farnam Streets in Omaha. Owen said a Boys Town resident, Richard "Jeff" Hubbell, had taken her to the party, the first of many such parties that Owen, Boner, and Danny King would attend at the Twin Towers. Owen told the grand jury that Robert Wadman, the chief of the Omaha Police Division during the time period in question, and Harold Anderson, the publisher of the Omaha World-Herald during that same time period, were "participants" in these parties. Owen reasserted all of these allegations at trial.

### (ii) Evidence

At trial, the State offered the testimony of Hubbell, who testified that he had met Owen at a dance one night in the summer of 1983, but had left the dance sometime before 11 p.m. and had never seen Owen again. Hubbell said he had never taken Owen to the Twin Towers and had never set foot in the complex himself. He disavowed any acquaintance with or knowledge of Larry King, the police chief, the newspaper publisher, and the other people to whom he allegedly had introduced Owen at the party in August 1983.

Bill Gehrig, the friend of Owen who testified that Owen had claimed to be working with Michael Casey on a Franklin investigation, testified that Owen had met Boner for the first time in the summer of 1988 at an Omaha bar called The Run. Boner corroborated Gehrig's testimony that he and Owen had first met in 1988, not 1983.

The State also offered the testimony of the police chief and the newspaper publisher, both of whom completely denied any participation in or knowledge of the parties described by Owen. Details of the testimony of the chief and the publisher will be brought out in our review of other counts that more directly involve those two men.

### (b) Count II

### (i) Alleged Perjury

In substance, Owen testified to the grand jury that she had attended a second party at the Twin Towers in late August or early September 1983. Owen said that adults in attendance included Larry King, the police chief, and the newspaper publisher. On that occasion, according to Owen, she stayed all night in Alfie Allen's apartment and had sex with Boner. She reasserted the allegations at trial.

### (ii) Evidence

We again point out that the police chief and the newspaper publisher denied all allegations pertaining to them and that Boner himself testified that he and Owen had first met in the summer of 1988, not 1983. Furthermore, Boner testified that he had never met Larry King. According to Boner, the

connection between himself and the alleged Twin Towers parties was the product of Owen's imagination. Boner testified that he first became involved in the Franklin affair when Gary Caradori, the investigator for the Legislature's "Franklin Committee," contacted him in November 1989 and wanted to know all about the sexual abuse Boner had suffered at the hands of Larry King and company. Boner testified that he had no idea what Caradori was talking about. He would later discover that Owen had already made a videotaped statement for the investigator and had named Boner as one of the victims of a child sexual abuse ring.

After an initial phone call, Boner met with Caradori in person. Caradori kept insisting that Boner come out with the truth about having been sexually abused. At that time, Boner still was not aware that Owen had identified him as a fellow victim. Caradori implied that he already knew Boner's story, but wanted Boner to verify the details. In an attempt to induce Boner to reveal his own experiences of sexual abuse, Caradori referred to prominent Omahans, including Larry King, and to incidents involving transportation of drugs and sexual exploitation with which he thought Boner was familiar. Perhaps most importantly, Caradori told Boner that within a year Boner would be receiving millions of dollars in civil damage awards and book and movie rights. Boner testified that although he knew nothing of the people or events mentioned by Caradori, he decided to play along and make a statement on videotape explaining how he had been victimized.

According to Owen, Larry King owned a penthouse apartment at the Twin Towers, but almost all the parties she attended at the Twin Towers in 1983 and 1984, including the one referred to in count II, were held in Allen's apartment, which was one or two floors below King's penthouse. Betty Cutler, a present owner of the Twin Towers, testified that according to her records Larry King was not a tenant at the Twin Towers in either 1983 or 1984. King first rented the east penthouse of the south tower of the complex on August 20, 1987, and apartment 3-B on February 2, 1988. Both leases terminated June 30, 1988. Cutler had no record of Allen ever occupying a Twin Towers apartment. Allen himself testified that he had never lived in or

rented an apartment at the Twin Towers. He denied any knowledge of the alleged series of parties described by Owen and claimed he had never met Owen.

### (c) Count III

#### (i) Alleged Perjury

In substance, Owen testified to the grand jury that at the first of the Twin Towers parties in August 1983, she saw the publisher of the World-Herald fondle a 12-year-old boy and later take him into a bedroom. She reasserted the allegation at trial.

#### (ii) Evidence

The newspaper publisher testified that Owen's allegations regarding him were "ridiculous lies." He said he had never been inside the Twin Towers. The publisher acknowledged that he knew Larry King. King had approached the publisher in the early 1980's and had asked him to help persuade Omaha businesses to make deposits into Franklin. Franklin was located in a low-income area of Omaha and served a low-income clientele. The publisher worked with other business leaders in Omaha to channel business deposits to Franklin, thereby increasing the credit union's deposits by $1 to $2 million. The publisher once attended a thank-you party hosted by King for those who had helped the credit union. The publisher also recalled seeing King at other social events, but never at the Twin Towers and never in the context alleged by Owen.

### (d) Counts IV and V

#### (i) Alleged Perjury

Count IV alleges in substance that Owen testified to the grand jury that sometime in September 1983, prior to her 15th birthday, she was sexually molested by the Omaha police chief at a Twin Towers party. She reasserted the allegation at trial.

Count V alleges in substance that Owen testified to the grand jury that a series of sexual encounters between herself and the Omaha police chief began September 21, 1983. The chief would pick her up once or twice a month on Wednesday afternoon and drive her to a motel in Council Bluffs, Iowa, for a sexual

encounter. This happened 20 to 25 times. The encounters with the chief ended in September 1984, when Owen became pregnant. Owen insisted that the chief had fathered the child. She reasserted these allegations at trial and claimed that some of the encounters occurred at motels in Bellevue.

### (ii) Evidence

The police chief testified that he had met Larry King in conjunction with community action programs aimed at reducing crime in the area of Omaha served by Franklin. He recalled seeing King socially on three occasions, but never at the Twin Towers and never at the type of parties described by Owen. The chief stated he had been inside the Twin Towers one time to address a meeting of either the Urban League or the NAACP on the subject of community relations with the police.

The police chief testified that he had never met Owen. He testified that he had given blood samples to three different laboratories that had conducted DNA testing and that all of the tests had confirmed that he was not the father of Owen's child. Eventually, a paternity suit against the chief was withdrawn.

Owen testified to the grand jury that the police chief was in good physical shape with no surgical scars. Given their many sexual encounters, Owen said she would have noticed any scars on the chief's body.

The police chief had been shot in the left arm while working as an undercover officer in Arizona in 1973. As a result of bone graft surgeries to repair the damaged arm, the chief has a noticeable scar on his left forearm from a "large, irregular incision running approximately from his wrist to his elbow." Surgeons had removed bone from the point of the right hip for use in the bone graft in the left forearm. The removal of bone from the hip left a "very large" and "easy-to-see" scar that extends around the front of the chief's right hip.

At her perjury trial, Owen offered a very detailed description of the police chief's body from head to toe but did not include the surgical scars described above. She dismissed as unconvincing a series of photographs of the scar on the chief's left forearm and refused to believe that the chief's left arm was 50 percent disabled. She said she never saw the scar on the

chief's right hip.

The State pointed out that Owen did not name the police chief as the father of her child until several years after the child was born. The State introduced testimony by several witnesses who claimed that Owen initially had named another man as the father of her child.

Owen's child was born May 1, 1985. On May 15, in the course of applying for welfare for her child, Owen told Mary Jane Krance, an income maintenance worker for the State of Nebraska, that the father of the child was Mark Burkhart. Owen testified at trial that she was afraid to name the police chief as the father for fear of possible repercussions that would result if the State sought reimbursement from the chief for welfare benefits paid to Owen. In three subsequent annual interviews to reevaluate the level of public assistance necessary, Owen continued to name Burkhart as the father. No father was named in Owen's application for 1989.

Ann O'Connor, a probation officer for Douglas County, prepared a presentence investigation report on Owen in September 1989 in conjunction with Owen's sentencing hearing following her conviction for passing bad checks. Owen told O'Connor that Burkhart was the father of Owen's child.

The State called Terry Clements, a friend and occasional sexual partner of Owen from December 1984 to February 1988, as a rebuttal witness to corroborate the fact that Owen initially had named Burkhart as the father of her child. Clements testified that while Owen was pregnant in the fall of 1984, she had explained to him that Burkhart was the best friend of her boyfriend and that she had slept with Burkhart to spite her boyfriend. According to Clements, Owen showed him a picture of Burkhart in her high school yearbook and an entry in her diary in which Owen referred to Burkhart as the father of her child.

### (e) Count VI

#### (i) Alleged Perjury

In substance, Owen testified to the grand jury that in March 1984 the police chief removed his gun from his shoulder holster and penetrated her vagina with the barrel of the gun. At her

perjury trial, Owen testified that at these motel trysts the chief always had a gun, either in a shoulder holster or tucked into the waistband of his pants.

### (ii) Evidence

The police chief testified that he did not own any holsters and that he had never carried a gun while in Omaha. A subordinate officer who had worked with the chief on a daily basis during the chief's 7½ years in Omaha testified that the chief had never worn a shoulder holster and had never carried a gun. The chief's personal secretary also testified that she had never seen him wear a shoulder holster or carry a gun.

### (f) Count VII

### (i) Alleged Perjury

In substance, Owen testified to the grand jury that in September 1983 she received a ride home from a Twin Towers party with Danny King and another person identified as "Larry the Kid," alleged by Owen to be the personal bodyguard of Larry King.

### (ii) Evidence

Special agent Mott testified that according to records obtained by the FBI's Houston office, Danny King was in the seventh grade at the North Shore Middle School in Galena Park, Texas, in September 1983. Danny King corroborated Mott's testimony. He testified that he was living with his mother in Galena Park and attending North Shore Middle School in the fall of 1983 and that he did not travel back and forth between Galena Park and Omaha on weekends. Danny King said he first met Owen in the summer of 1988, not 1983. He claimed that he had never met Larry King or Larry the Kid and that he had never been inside the Twin Towers.

### (g) Count VIII

### (i) Alleged Perjury

In substance, Owen testified to the grand jury that she had met Theodore Carlson, a judge of the Douglas County District Court, at a reception hosted by Larry King at the French Cafe in Omaha on a Saturday afternoon in October 1983. Owen said

she had performed oral sex on the judge in the basement of the French Cafe sometime between 1:30 and 4 p.m. while the reception was going on upstairs. She reasserted the allegations at trial.

### (ii) Evidence

Judith Moore, an employee at the French Cafe since 1974 and the general manager since 1976, contradicted Owen's grand jury testimony on two facts related to the alleged incident involving the judge. First, Owen had testified that a blond-haired woman named "Shiela" had managed the reception, but Moore testified that no such woman had ever worked for the French Cafe since Moore had joined the staff in 1974. Second, Owen had testified that 25 to 35 people had attended the reception on the main floor of the restaurant. As general manager, Moore would have been responsible for such a gathering, but she did not recall any such function on a Saturday in October 1983. She checked the restaurant's books and found no record of such a party. The only party hosted by Larry King at the French Cafe in 1983 took place on April 1.

Mott testified that Owen had told him that her first encounter with the judge had taken place December 21, 1983, at a motel in Council Bluffs. Owen acknowledged at trial that on videotape she had said that she first met the judge in April 1984. She testified at trial that she had first learned of the judge's identity in 1986 when she recognized him from a distance at the courthouse and asked a bystander for the judge's name. Given the alleged encounters in 1983, the recognition and identification in 1986, and Owen's detailed description of the judge's face at trial, the prosecutor asked Owen why she was unable to identify the judge in a series of photographs presented to her by Caradori. Owen replied that she was not wearing her glasses at the time, that there were 30 to 40 "little black and white" photographs, and that the judge was wearing glasses in the Caradori photograph, while Owen had seen the judge only without glasses.

The judge testified that he had never had any contact with Owen, and he accounted for his whereabouts on every Saturday afternoon in October 1983.

## 5. CONVICTION AND POSTTRIAL PROCEEDINGS

### (a) Judgment and Sentence

Owen was convicted on all eight counts of perjury and was sentenced to a prison term of 3 to 5 years on each count as follows:

> Sentence[s] imposed as to Counts I, II and III shall be served concurrent to each other and consecutive to the sentence now being served.
>
> The sentences imposed on Counts IV, V and VI shall be served concurrent to each other and consecutive to Counts I, II and III.
>
> The sentences imposed as to Counts VII and VIII shall be served concurrent with each other and consecutive to the sentences imposed on Counts IV, V and VI.

The judgment and sentences were rendered August 8, 1991.

### (b) Motion for New Trial

On August 20, argument was heard on Owen's motion for a new trial. Of the various arguments put forward to support the motion, we are concerned with those based on information contained in posttrial affidavits signed by defense counsel and two jurors. According to the affidavits, the following incidents occurred during the course of jury deliberation:

The jury commenced deliberation at 9 a.m. on June 19, 1991, and continued deliberating until evening recess at 4:30 p.m. One of the juror affidavits stated that the trial judge entered the jury room prior to evening recess on June 19 to admonish the jurors concerning their separation. The affiant claimed that at that time, although an instruction on the term "reasonable doubt" had been given to the jury, the judge was asked for further definition of the term. The affiant stated that the judge responded to the request for further definition of reasonable doubt by saying that "what is a reasonable doubt is to be left up to each individual juror." (During the hearing on the motion for new trial, the judge denied making any substantive comment on reasonable doubt and insisted that he had told the jurors he could not discuss the term without both lawyers present.) The affiant stated that several jurors, while at home on the evening of June 19, consulted dictionaries for

definitions of the words "reasonable" and "doubt," wrote down the definitions, brought the dictionary definitions with them into the jury room when deliberations were resumed on the morning of June 20, and recited the definitions to their fellow jurors.

Deliberations on June 20 continued until approximately noon. At that time, according to another of the juror affidavits, the jury foreman informed the bailiff that the jury had reached an impasse and was unable to agree on a verdict. The affiant believed that the bailiff had communicated this information to the judge. The affiant stated that the bailiff returned to the jury room and verbally communicated a message from the judge that, considering the length of the trial (5 weeks), it was too early in the process for the jurors to abandon the effort to reach a verdict.

The jury continued deliberating the rest of June 20 and resumed deliberations on the morning of June 21. A verdict was reached at approximately 11 a.m. on June 21.

Defense counsel argued that Owen deserved a new trial because (1) the alleged response to the question on reasonable doubt on June 19 and the message to keep deliberating on June 20 constituted instructions by the judge that should have been given in open court with the parties present and (2) the dictionary definitions of the words "reasonable" and "doubt" constituted extraneous prejudicial information improperly brought to the jury's attention. In support of these contentions, defense counsel offered the juror affidavits discussed above. The State objected to the offer of the affidavits.

During the hearing on the motion, defense counsel repeatedly asked the judge to recuse himself so that an impartial judge could conduct an evidentiary hearing and rule on whether there had been misconduct warranting a new trial. The judge denied the motion for recusal of himself and refused to admit any of the affidavits into evidence. (Although not admitted into evidence, the affidavits are included in the record on appeal.) There was no evidentiary hearing on the allegations of prejudicial misconduct by the judge and jury. The motion for new trial was taken under advisement.

On September 5, 1991, the trial judge issued an order

overruling the motion for new trial. In the order, the trial judge did not make any specific findings or provide any substantive discussion of the allegations of prejudicial misconduct by himself and the jury.

## II. ASSIGNMENTS OF ERROR

Owen assigns 24 errors. We refuse to consider assignments of error not discussed in the opening or supplemental briefs. See *State v. Moss*, 240 Neb. 21, 480 N.W.2d 198 (1992). We have consolidated the remaining assignments of error, which we address individually in the analysis below.

## III. STANDARD OF REVIEW

The errors assigned pertain to decisions by the trial judge on admission of evidence, limitation of cross-examination, pretrial motion procedure, misconduct by the prosecutor and the trial judge, and motions for mistrial and new trial. We are guided by the following rules of appellate review:

### 1. GENERAL PRINCIPLES

Judicial abuse of discretion means that the reasons or rulings of the trial judge are clearly untenable and unfairly deprive a litigant of a substantial right and a just result. *State v. Thomas*, 238 Neb. 4, 468 N.W.2d 607 (1991).

Harmless error exists when there is some incorrect conduct by the trial court which, on review of the entire record, did not materially influence the jury in a verdict adverse to a substantial right of the defendant. *State v. Coleman*, 239 Neb. 800, 478 N.W.2d 349 (1992).

Regarding a question of law, an appellate court has an obligation to reach a conclusion independent of that of the trial court in a judgment under review. *Nebraska Builders Prod. Co. v. Industrial Erectors*, 239 Neb. 744, 478 N.W.2d 257 (1992).

### 2. PRETRIAL ORDERS

As a general rule, a trial court has broad discretion in regard to amendment of a pretrial order, and its ruling with respect thereto will not be disturbed absent an abuse of that discretion. *State v. Hinn*, 229 Neb. 556, 427 N.W.2d 791 (1988).

### 3. Admission of Evidence

In proceedings where the statutes embodying the rules of evidence apply, the admission of evidence is controlled by rule and not by judicial discretion, except where judicial discretion is a factor involved in assessing admissibility. *State v. Timmerman*, 240 Neb. 74, 480 N.W.2d 411 (1992).

Erroneous admission of evidence is harmless error and does not require reversal if the evidence erroneously admitted is cumulative and other relevant evidence, properly admitted or admitted without objection, supports the finding by the trier of fact. *State v. Melton*, 239 Neb. 790, 478 N.W.2d 341 (1992).

To be relevant, evidence must be rationally related to an issue by a likelihood, not a mere possibility, of proving or disproving an issue to be decided. *State v. Coleman, supra.*

It is within the discretion of the trial court to determine the admissibility of evidence of other wrongs or acts, and the trial court's decision will not be reversed absent an abuse of that discretion. Neb. Rev. Stat. § 27-404(2) (Reissue 1989); *State v. Christian*, 237 Neb. 294, 465 N.W.2d 756 (1991).

To determine whether unfair prejudice existed in the admission of evidence under § 27-404(2), an appellate court considers (1) whether the evidence was relevant, (2) whether the evidence had a proper purpose, (3) whether the probative value of the evidence outweighed its potential for unfair prejudice, and (4) whether the trial court, if requested, instructed the jury to consider the evidence only for the purpose for which it was admitted. *State v. Stueben*, 240 Neb. 170, 481 N.W.2d 178 (1992).

### 4. Cross-Examination

In the absence of an abuse of discretion, a trial court's ruling regarding the extent, scope, and course of cross-examination will be upheld on appeal. *State v. Blair*, 230 Neb. 775, 433 N.W.2d 518 (1988).

### 5. Mistrial

A mistrial is properly granted only when an event occurs during the course of a trial which is of such a nature that its damaging effects cannot be removed by proper admonition or instruction to the jury and would thus result in preventing a fair

trial. The decision to grant a motion for mistrial is within the discretion of the trial court and will be upheld on appeal absent a showing of abuse of discretion. *State v. Bronson*, 242 Neb. 931, 496 N.W.2d 882 (1993).

### 6. MISCONDUCT

In order for error to be predicated upon misconduct of counsel, it must be so flagrant that neither retraction nor rebuke from the court can entirely destroy its influence. *Id.*

### 7. MOTION FOR NEW TRIAL

A motion for new trial is addressed to the discretion of the trial court. In the absence of an abuse of discretion, a trial court's disposition of a motion for new trial will be upheld on appeal. *Loving v. Baker's Supermarkets*, 238 Neb. 727, 472 N.W.2d 695 (1991).

## IV. ANALYSIS

### 1. PRETRIAL MOTIONS

Assignment of error: The court erred in overruling Owen's pretrial motions without first conducting an evidentiary hearing on the motions.

Owen acknowledges that the motions at issue were filed after the deadline for pretrial filings established by the court. However, she cites *State v. Hinn*, 229 Neb. 556, 427 N.W.2d 791 (1988), for the proposition that rules regarding pretrial orders do not apply to criminal cases. Owen is mistaken. In the statement relied on by Owen, the Supreme Court referred specifically to pretrial *conferences*:

> Although, as a general rule, a trial court has broad discretion in regard to amendment of a pretrial order, and its ruling with respect thereto will not be disturbed absent an abuse of that discretion, we do not agree with the court that the general rules regarding pretrial *conferences* apply to criminal defendants.

(Emphasis supplied.) *Id.* at 559, 427 N.W.2d at 794. *Hinn* does not suspend in criminal cases the rule that pretrial orders are made by the trial court in its discretion. In the case at bar, the trial court issued and enforced a pretrial order limiting the timeframe for the filing of pretrial motions. We will not disturb

the trial court's ruling on the pretrial motions filed out of time unless that ruling was clearly untenable and unfairly deprived Owen of her right to a fair trial.

Owen asserts that, by refusing to consider the pretrial motions filed out of time, the court prevented defense counsel from engaging in discovery and preparing a substantive defense. We reject that assertion. The trial court did not prevent defense counsel from engaging in discovery and preparing his case. Defense counsel had over 8 months to engage in discovery and prepare a defense, and he had 11 days' notice of the filing deadline. Defense counsel bore the responsibility for any difficulties he experienced as a result of missing the filing deadline. We find nothing in the record to indicate that the trial court abused its discretion by adhering to its deadline for pretrial filings.

### 2. MOTION TO QUASH THE INDICTMENT

Assignment of error: The court erred in refusing to consider the motion to quash the grand jury indictment, which failed to allege a crime.

For two reasons, we do not reach the merits of Owen's argument for quashing the indictment. First, the motion to quash was one of the pretrial motions filed out of time. Second, even if the motion had been timely filed, at her arraignment Owen waived the right to quash the indictment when she entered a plea of not guilty to the eight counts of perjury alleged in the indictment. See Neb. Rev. Stat. § 29-1812 (Reissue 1989) (by pleading the general issue, the accused shall be taken to have waived all defects which may be excepted to by a motion to quash). See, also, *State v. Bocian*, 226 Neb. 613, 413 N.W.2d 893 (1987) (all defects that may be excepted to by a motion to quash are taken as waived by a defendant pleading the general issue).

### 3. PROSECUTORIAL MISCONDUCT

Assignment of error: The court erred in refusing to grant a mistrial based on prosecutorial misconduct at trial.

A party who fails at trial to make a timely motion for mistrial based on prosecutorial misconduct waives the right to assert on appeal that the trial court erred in not declaring a mistrial due to

prosecutorial misconduct. See *State v. Armstrong*, 1 Neb. App. 21, 485 N.W.2d 341 (1992). A party may not raise alleged misconduct of adverse counsel on appeal where, despite knowledge of the alleged misconduct, the party claiming the misconduct failed to request a mistrial and instead agreed to take the chances of a favorable verdict. *State v. Anderson and Hochstein*, 207 Neb. 51, 296 N.W.2d 440 (1980). Owen never moved for a mistrial on grounds of prosecutorial misconduct, so this assignment of error is not properly before us.

We briefly review the issue for plain error. See *State v. Wilcox*, 239 Neb. 882, 479 N.W.2d 134 (1992) (plain error may be found on appeal when an error, unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would cause a miscarriage of justice or damage the integrity, reputation, and fairness of the judicial process). If the prosecutor did engage in the sort of misconduct alleged by Owen on appeal, such misconduct could well have prejudiced Owen's right to a fair trial and resulted in a miscarriage of justice damaging to the integrity of the judicial process.

Animosity between the prosecutor and defense counsel (not Owen's counsel in this appeal) developed during pretrial proceedings, with defense counsel at one point directing profanity at the prosecutor. The judge threatened defense counsel with contempt if he directed another "threat" or "vilification" at the prosecutor or anyone else in the courtroom. The acrimonious courtroom atmosphere created during pretrial proceedings persisted throughout the trial.

We must point out that many of the occasions of alleged prosecutorial misconduct cited by Owen in her brief were simply instances where the prosecutor raised and argued legitimate objections. That said, the record also shows that the prosecutor made his share of hostile remarks during the trial. However, the record indicates that defense counsel consistently fired the first shots across the bow in pretrial proceedings and continued to goad the prosecutor during the trial with a steady stream of petulant and derisive comments. Defense counsel cannot harass the prosecutor until he gets a response in kind and then turn around and claim that the court erred by not

declaring a mistrial based on the prosecutor's retaliatory comments. In any event, the prosecutor's occasional lapses in professional decorum were not so flagrant that they prejudiced Owen's right to a fair trial.

### 4. JUDICIAL MISCONDUCT

Assignment of error: The court engaged in misconduct that was unduly prejudicial to Owen.

A claim of improper conduct on the part of the trial judge in the presence of the jury will not be reviewed on appeal in the absence of a timely objection. *Pitt v. Checker Cab Co.*, 217 Neb. 600, 350 N.W.2d 507 (1984). Although there are numerous occasions in the record where tempers flared during argumentative exchanges between the trial judge and defense counsel, Owen never moved for a mistrial on grounds of judicial misconduct. Therefore, she failed to preserve that issue for appellate review. However, as in the case of the allegation of prosecutorial misconduct, we review the issue for plain error to determine whether a miscarriage of justice occurred.

On this issue, Owen offers the general allegation that the trial judge criticized defense counsel while treating the prosecutor with a contrasting degree of respect "in front of the jury on numerous occasions." Brief for appellant at 18. In support of this contention, Owen then sets out 37 citations to the record. Owen next proffers several pages of propositions of law regarding judicial misconduct. Owen concludes this section of the brief with the sweeping assertion that it was "inconceivable that the jury did not understand that the trial judge was impatient with, intolerant of, and disrespectful of defense counsel and the defendant" to such a degree that Owen was deprived of her right to a fair and impartial trial. Brief for appellant at 22-23. Owen provides no argument connecting the alleged instances of misconduct in the record with the propositions of law governing misconduct and fair trial. The allegedly prejudicial statements of the trial judge in this case are not examined and measured against the incidents of judicial misconduct found to be prejudicial in the case law cited by Owen.

Upon review of the entire record, we find that the trial judge

showed a considerable amount of patience with defense counsel. Owen's allegation of misconduct by the trial judge is not supported by the record. This assignment of error is without merit.

### 5. WELFARE AND PRESENTENCE REPORT INFORMATION

Assignment of error: The court erred in admitting into evidence information related to Owen's applications for medicaid benefits for her child and information from a presentence investigation report on Owen prepared in relation to a prior offense.

### (a) Welfare

Mary Jane Krance, an income maintenance worker for the State of Nebraska, testified for the State that, in the course of applying annually for medicaid benefits for her child from 1985 to 1988, Owen had named Mark Burkhart, not the police chief, as the father of the child. Neb. Rev. Stat. § 68-313 (Reissue 1990) states that

> [i]t shall be unlawful, except as permitted by section 68-313.01 and except for purposes directly connected with the administration of general assistance . . . for any person or persons to . . . make use of . . . any information concerning . . . persons applying for or receiving such aid or assistance, directly or indirectly derived from the records, papers, files, or communications of the state . . . or acquired in the course of the performance of official duties.

Under Neb. Rev. Stat. § 68-313.01 (Reissue 1990),

> [m]embers of the Nebraska Legislature and all state and county officials of this state shall have free access at all times to all records and information in connection with the aid and assistance referred to in section 68-313. The public shall have free access to all information concerning lists of names and amounts of payments which appear on any financial records, except that no lists shall be used for commercial or political purposes.

We can find nothing in §§ 68-313 and 68-313.01, in the legislative histories of the two statutes, or in Nebraska case law that permits the State to introduce Krance's testimony

regarding Owen's identification of someone other than the police chief as the father of her child. In its brief and at oral argument, the State failed to offer any authority for the use of Krance's testimony as evidence against a defendant in a criminal trial. Section 68-313 allows the entities described in § 68-313.01 to make use of welfare-related information for purposes directly connected with the administration of general assistance. Certainly, the county attorney's office is allowed access to Owen's welfare records under § 68-313.01 and would be authorized to use information from those records to prosecute a welfare applicant for defrauding the Department of Social Services. However, the statutes read together prohibit the use of welfare-related information as evidence against a welfare applicant in a criminal trial not directly connected with the administration of general assistance. Therefore, the trial court erred in admitting the testimony of Krance on the matter of the man originally named by Owen as the father of the child for whom Owen sought medicaid benefits.

### (b) Presentence Report

Ann O'Connor, a probation officer for Douglas County, testified for the State that while she was in the course of preparing a presentence investigation report on Owen in September 1989 in conjunction with Owen's sentencing hearing following her conviction for passing bad checks, Owen had told O'Connor that Burkhart was the father of her child.

Neb. Rev. Stat. § 29-2261(6) (Reissue 1989) states that

> [a]ny presentence report . . . shall be privileged and shall not be disclosed directly or indirectly to anyone other than a judge, probation officers to whom an offender's file is duly transferred, or others entitled by law to receive such information. The court may permit inspection of the report . . . by the offender or his or her attorney, or other person having a proper interest therein, whenever the court finds it is in the best interest of a particular offender.
> . . .

We can find no authority in § 29-2261, in its legislative history, or in Nebraska case law that permits the State to introduce O'Connor's testimony that in 1989 Owen had

identified Burkhart as the father of her child.

The State argues that information derived from Owen's 1989 presentence report is admissible under *Minnesota v. Murphy*, 465 U.S. 420, 104 S. Ct. 1136, 79 L. Ed. 2d 409 (1984). We do not find *Murphy* helpful in reviewing this assignment of error. *Murphy* dealt with the issue of whether a probationer was in custody, and thus entitled to a *Miranda* warning, when he made an incriminating statement to his probation officer. *Murphy* does not address the privilege against disclosure of information from a presentence investigation report prepared for a sentencing hearing. The State offers no substantive argument to explain how *Murphy* overrides, or qualifies as an exception to, the privilege established by the Nebraska Legislature in § 29-2261. We are not trying to resolve whether Owen was in custody and compelled to identify the father of her child. The privilege in § 29-2261 applies even if Owen was not in custody and not compelled to identify the father of her child.

Neither the legislative history nor the case law citing § 29-2261 sheds any light on who might comprise the group of "others entitled by law to receive such information," but we are unwilling to expand that group to include jurors in a criminal trial. Therefore, the trial court erred in admitting O'Connor's testimony that in 1989 Owen had named Burkhart as the father of her child.

(c) Harmless Error

Despite an error by a trial court in admitting evidence, an appellate court may affirm a trial court judgment if the error in admission of evidence was harmless beyond a reasonable doubt. See *State v. Christian*, 237 Neb. 294, 465 N.W.2d 756 (1991). Erroneous admission of evidence is harmless error and does not require reversal if the evidence erroneously admitted is cumulative and other relevant evidence, properly admitted or admitted without objection, supports the finding by the trier of fact. See *State v. Coleman*, 239 Neb. 800, 478 N.W.2d 349 (1992). "Cumulative evidence" means tending to prove the same point to which other evidence has been offered. *Id.*

The importance of the testimony by Krance and O'Connor was weakened by Owen's testimony that she had falsely

identified the father of her child because she feared reprisals if she identified the police chief as the father. Given the nature of Owen's allegations against the chief, her reason for giving false information to state agencies was plausible.

Owen had no plausible rebuttal to the testimony of Terry Clements. Clements testified that at the time she was pregnant, Owen had told him that Burkhart was the father of her baby. Clements said Owen had shown him a picture of Burkhart in her high school yearbook and an entry in her diary in which Owen referred to Burkhart as the father of her child.

The most probative evidence on this issue was derived from the testimony concerning the police chief. Owen testified that she and the chief had engaged in sexual relations on many occasions. Indeed, she claimed to have seen the chief naked often enough that she could give a detailed description of the chief's body from head to toe, which she did for the record. However, in her physical description of the chief Owen neglected to mention large and permanent scars on the chief's left arm and right hip and the noticeable atrophy and disability of the chief's left arm and hand. This failure to identify inescapably obvious physical features severely undermined Owen's claim to having had sex with the chief, which in turn undermined her claim that the chief had fathered her child. Most important is the fact that the chief's unequivocal denial of any contact at all with Owen was bolstered by his testimony, unchallenged at trial by defense counsel, that several DNA blood tests had confirmed that he was not the father of Owen's child. Upon review of the record, it is clear that the chief's testimonial evidence that genetic testing had proven that he had not fathered Owen's child eclipsed all the other evidence and testimony on this issue.

The testimony of Krance and O'Connor was cumulative evidence. Given the probative weight of the testimony of Clements and especially the testimony of the police chief, we find beyond a reasonable doubt that the decision of the jury on this question would have remained the same even without the testimony of Krance and O'Connor. Therefore, the trial court's admission of the testimony of Krance and O'Connor constituted harmless error.

## 6. Prior Bad Acts

Assignment of error: The court erred in allowing the State to introduce evidence of prior bad acts by Owen.

In her brief, Owen claimed that the State had introduced evidence of prior crimes and bad acts in order to "bring her character into disrepute." Brief for appellant at 31. In support of that contention, she set out 53 citations to the record. Owen did not offer substantive argument on any of the 53 instances of alleged error concerning evidence of prior conduct. Instead, Owen set out 5½ pages of propositions of law regarding relevancy, probative value versus unfair prejudice, harmless error, and prosecutorial misconduct in relation to the offering of evidence of prior criminal conduct. Owen concluded her argument with the following paragraph:

> In this case, the prosecution managed to admit into evidence testimony regarding the defendant's prior crimes of issuing bad checks, prior promiscuous behavior on the part of the defendant, prior instances of the defendant's lying, character evidence showing the defendant's tendency to lie, evidence of the [d]efendant's involvement in drug use and sales, evidence regarding a mental health hospitalization of the [d]efendant, and other similar character evidence. The admission of this evidence was prejudicial to the defendant and was specifically introduced for the purpose of prejudicing the defendant in the minds of the jury.

Brief for appellant at 37.

Many of the 53 sections of the record cited by Owen do not contain an objection by defense counsel. A party waives the right to assert on appeal prejudicial error concerning admission of evidence when that evidence is received at trial without objection. *State v. Chapman*, 234 Neb. 369, 451 N.W.2d 263 (1990). Regarding the remainder of the citations to the record, Owen does not make specific connections between the propositions of law set out in the brief and the alleged occasions of erroneous admission of evidence at trial. For substantive argument, Owen offers only the sweeping paragraph quoted above, which essentially says that the State brought out facts about Owen's past that undermined her character in front of the

jury. Owen does not explain why the portions of testimony cited in her brief were unfairly prejudicial, irrelevant, or in some other way inadmissible. Therefore, we treat this error as one assigned but not discussed, and we refuse to consider it. See *State v. Moss*, 240 Neb. 21, 480 N.W.2d 198 (1992).

### 7. FIFTH AMENDMENT CHALLENGE

Assignment of error: The court erred in excluding evidence regarding the circumstances under which statements by Owen were obtained while Owen was in prison.

The only portion of the record cited by Owen to support this assignment of error involved an instance where the court sustained an objection by the State when defense counsel asked an FBI investigator whether Owen had been in custody during her interviews with him at the Center for Women. In pretrial proceedings, the trial court had ruled that *Miranda* warnings had not been required during those interviews because Owen had offered the statements voluntarily. Nonetheless, defense counsel attempted at trial to bring out the fact that Owen had never been given *Miranda* warnings by State Patrol and FBI interviewers. The State objected to the questioning about *Miranda* warnings on grounds that defense counsel was implying to the jury that the law enforcement officers had been required to give Owen *Miranda* warnings. In sustaining the objection, the court instructed defense counsel to "stay away from" the subjects of custodial interrogation and *Miranda* warnings.

Owen was obliged to raise her Fifth Amendment challenge before trial. See Neb. Rev. Stat. § 29-115 (Reissue 1989) (generally, unless claims of a statement being involuntary or taken in violation of the Fifth Amendment are raised by motion before trial, all objections to the use of such statement shall be deemed waived). See, also, *State v. Warren*, 227 Neb. 160, 416 N.W.2d 249 (1987) (any objection as to the voluntariness of a statement of a defendant in a criminal case must be made as a pretrial motion to suppress the statement; failure to object at this stage results in a waiver of the objection). However, the final sentence of § 29-115 states that none of the provisions requiring that objections be raised before trial shall affect the

right of the defendant to present to the fact finder at trial "the question of whether the proper constitutional safeguards were given to any defendant either in custody or otherwise significantly deprived of his or her liberty . . . ." Owen relies on this language as a catchall provision pursuant to which her right to raise Fifth Amendment issues before the jury at trial was preserved.

Owen is mistaken because she was not being detained by the investigators who were interviewing her. The Nebraska Supreme Court has stated that

"incarceration does not *ipso facto* render an interrogation custodial, *Cervantes v. Walker*, 589 F.2d 424, 427 (9th Cir.1978), *cited in Flittie v. Solem*, 775 F.2d 933, 944 (8th Cir.1985) (en banc). In all cases, we must consider the totality of the circumstances, including the individual's 'freedom to leave the scene and the purpose, place and length' of the questioning. [Citation omitted.] When an individual is incarcerated for an unrelated offense, this requires some restriction on his freedom of action in connection with the interrogation itself. *See Cervantes*, 589 F.2d at 427-28."

*State v. Bradley*, 236 Neb. 371, 393, 461 N.W.2d 524, 540 (1990) (quoting *Leviston v. Black*, 843 F.2d 302 (8th Cir. 1988), *cert. denied* 488 U.S. 865, 109 S. Ct. 168, 102 L. Ed. 2d 138). In *Bradley*, an associate of the defendant, Bradley, had telephoned Bradley at two locations, the correctional center where Bradley was held in custody and the shop where Bradley worked under the supervision of the Department of Correctional Services. The phone calls were recorded by police, and Bradley made incriminating statements later used against him. Bradley argued that the trial court had erred by admitting the phone conversations into evidence because he was in custody when the statements were made and was not given *Miranda* warnings prior to the recorded phone conversations. The Supreme Court held that the phone conversations were admissible against Bradley because "[i]t was common for Bradley to engage in telephone conversations at these locations. Under the circumstances, Bradley could not have felt compelled to speak with [his associate] on the telephone, and he could have

discontinued the conversation at any time." *Bradley*, 236 Neb. at 393-94, 461 N.W.2d at 540.

When we ask whether the defendant was subjected to custodial interrogation requiring a *Miranda* warning, we are asking whether the person to whom the defendant made the statement was exercising custodial or compelling force on the defendant in order to coerce the defendant into making the statement. Although she was incarcerated, Owen was not in the custody of the investigators who took statements from her while she was in prison, nor were those investigators depriving her of her liberty. The record indicates that the investigators approached Owen as a possible victim and made it clear to her that she was under no compulsion to speak with them. Owen was in the custody of prison officials during the interviews, but she was accompanied by her attorney during all interviews with the investigators except the initial inquiry, and she was free at all times to disengage herself from the interviews and leave the room in which the interviews were conducted. Given her freedom to leave the scene of the interviews and the purpose of the interviews, Owen was not a defendant either in custody or otherwise significantly deprived of her liberty when she made the statements to the investigators. Therefore, Owen was not entitled to raise before the jury Fifth Amendment issues regarding custodial interrogation and *Miranda* warnings, and the trial judge properly excluded evidence regarding the circumstances under which the statements were obtained.

## 8. BLOOD TEST

Assignment of error: The court erred in permitting the police chief to testify as to the results of genetic blood testing.

Defense counsel made no objection while the police chief testified that the results of genetic blood tests had confirmed that he was not the father of Owen's child. A party waives the right to assert on appeal prejudicial error concerning admission of evidence when that evidence is received at trial without objection. *State v. Chapman*, 234 Neb. 369, 451 N.W.2d 263 (1990). Therefore, this assignment of error is not properly before the court, and we refuse to consider it.

### 9. PEREMPTORY CHALLENGES

Assignment of error: The court erred in refusing to grant a mistrial due to the State's discriminatory use of peremptory challenges during jury selection.

Of the six people excused from the jury on peremptory challenges by the State, five were women. The State also used a peremptory challenge to excuse a woman from the pool of alternate jurors. There is nothing in the record to indicate explicitly that the women were excused solely because of their gender. However, even if the State had excused the women because of their gender, Owen acknowledges in her supplemental brief that the Nebraska Supreme Court has held that the federal constitutional rule prohibiting strikes based on race does not apply to strikes based on gender. See *State v. Culver*, 233 Neb. 228, 444 N.W.2d 662 (1989).

Owen argues that *Culver* should not be followed by this court. On federal constitutional questions, this court is bound by precedent from two sources: the Nebraska Supreme Court and the U.S. Supreme Court. To date, the U.S. Supreme Court has not expanded the rule prohibiting strikes based on race to include strikes based on gender, see *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), and the Nebraska Supreme Court has not modified its ruling in *Culver* regarding gender-based strikes. Therefore, the trial court was correct in overruling the motion for mistrial based on alleged discriminatory exercise of gender-based peremptory challenges by the State.

### 10. LIMITATION OF CROSS-EXAMINATION

Assignment of error: The court erred by improperly limiting cross-examination by defense counsel.

This is another assignment of error not supported by substantive argument. In her supplemental brief, Owen offers 10 citations to the record, 1 of them 16 pages long, in support of her claim that the trial court improperly limited the scope of defense counsel's cross-examination of the State's witnesses. Owen cites propositions of law regarding impeachment of witnesses and proper scope of cross-examination and then concludes her argument by asserting that "the trial court

abused its discretion in refusing to allow the defendant sufficient latitude to attack the credibility and accuracy of the witnesses against her." Supplemental brief for appellant at 20. There is not one word of argument in this section of Owen's supplemental brief explaining how or why the trial court erred in its limitation of cross-examination. The appellant cannot simply present a litany of citations to the record and leave it to the court to develop an argument to support the appellant's assignment of error. We will not find error in the limitation of cross-examination unless we find that the rationale of the trial court for limiting cross-examination was clearly untenable. Owen offers no argument demonstrating that the trial court's rulings on the scope of cross-examination were untenable, and upon review of the record, we find no abuse of discretion in the limitation of cross-examination.

## 11. HEARSAY

Assignment of error: The court erred in allowing hearsay evidence against Owen.

In support of this assignment of error, Owen provided four citations to the record and proffered the blanket assertion that each cited portion of the record constituted an occasion on which the trial court erred by admitting hearsay. She then cited several propositions of law concerning hearsay and concluded the argument with the assertion that the hearsay evidence admitted against Owen violated the Nebraska rules of evidence and Owen's right to confrontation. There is no discussion of the actual testimony that Owen claims was hearsay, no discussion of why the trial court erred in allowing the challenged testimony, and no discussion of how Owen was denied her right to confrontation, and no such denial is obvious from the record. Therefore, we treat this error as one assigned but not discussed, and we refuse to consider it. See *State v. Moss*, 240 Neb. 21, 480 N.W.2d 198 (1992).

## 12. EVIDENCE REGARDING SCHMIT AND DECAMP

Assignment of error: The court erred in admitting prejudicial and irrelevant evidence.

State Senator Loran Schmit testified as a witness for Owen. Schmit had served as the chairman of the Legislature's Franklin

Committee and had allowed Gary Caradori to work out of his office at the State Capitol. Schmit testified that Troy Boner came to his State Capitol office shortly after the death of Caradori in a plane crash in July 1990 and informed Schmit that he (Boner) had told Caradori the truth. While testifying before the Douglas County grand jury in March 1990, Boner had recanted the story he had told Caradori. Boner had told the grand jury that the allegations about a child sexual abuse ring were false. According to Schmit, though, in July 1990 Boner said he had recanted the original story he told to Caradori at the prodding of the FBI.

The direct examination of Schmit was limited to the workings of the Franklin Committee and the meeting with Boner in July 1990. On cross-examination, the prosecutor questioned Schmit about his involvement in the video gambling industry and about his relationship with John DeCamp, a former colleague in the Legislature and one of Schmit's personal attorneys at the time of the trial. (DeCamp is counsel to Owen in this appeal.) The State brought out several reasons why Schmit might have wanted to see Owen's version of the Franklin scandal vindicated. Schmit testified on cross-examination that in 1984 the World-Herald, published at the time by Harold Anderson, had editorialized very heavily against the video gambling industry as a whole and against Schmit personally because of his involvement in the industry and his efforts in the Legislature to protect the industry. Schmit said that he had lost a great deal of money that he had invested in a video slot machine business when the Legislature outlawed the machines in 1984. On the matter of Schmit's relationship with DeCamp, Schmit testified that on January 12, 1990, DeCamp hosted a dinner meeting at his home at which DeCamp, Schmit, Caradori, and Owen's initial lawyer (not her trial counsel) discussed how Owen's case should be handled. The record indicates that on January 18, DeCamp released a memorandum addressed to a World-Herald reporter and "the public" in which Anderson was identified as one of several prominent Omahans involved in the alleged Franklin scandal. A copy of the memorandum was found amongst Owen's personal papers.

Owen argues that the court erred by allowing the prosecutor to inquire into previous World-Herald commentary critical of Schmit and into Schmit's relationship with DeCamp, subjects not raised on direct examination. We do not reach the merits of this assignment of error because the issue was not properly preserved for appellate review.

One who fails to object to or move to strike testimony may not predicate error on its admission. *State v. Campbell*, 239 Neb. 14, 473 N.W.2d 420 (1991). To preserve a claimed error in the admission of evidence, a litigant must make a timely objection which specifies the ground of the objection to the offered evidence. *State v. Armstrong*, 1 Neb. App. 21, 485 N.W.2d 341 (1992). In the 16 pages of the record in which the cross-examination of Schmit touched upon Schmit's rift with the World-Herald and his relationship with DeCamp, defense counsel made only one objection directed at those two subjects. The objection was made in response to the prosecutor's question to Schmit asking how much money he had lost in the video slot machine matter. Defense counsel objected on grounds that the line of questioning had nothing to do with the workings of the Franklin Committee or Boner's visit to Schmit's office. The prosecutor responded that the questioning dealt with Schmit's possible motive and bias. The objection was overruled. A great deal of the testimony challenged by Owen on appeal had already been admitted into the record by the time defense counsel made this limited objection. Subsequent to the objection, more testimony, most notably the information about the January 12 meeting at DeCamp's home, was admitted without a specific objection on the grounds set forth on appeal. Therefore, this assignment of error was not properly preserved in the record, and we refuse to consider it.

### 13. MISCONDUCT DURING JURY DELIBERATIONS

Assignment of error: The court erred in refusing to grant Owen's motion for new trial based on misconduct by the judge and jury during jury deliberations.

We refer the reader to the facts in § I(5)(b) for a review of the allegations concerning misconduct by the judge and jury during jury deliberations.

### (a) Further Instruction to Jury

One of the juror affidavits alleged that the trial judge entered the jury room at the conclusion of the first day of deliberations and gave the following response to a juror's question about the meaning of the term "reasonable doubt": "[W]hat is a reasonable doubt is to be left up to each individual juror." If the allegation is true, the trial judge gave what could be construed as a further instruction on reasonable doubt without putting the further instruction in writing. Once the jury has commenced deliberation, no oral explanation of any instruction is allowed. See Neb. Rev. Stat. § 25-1115 (Reissue 1989). Any instruction given to the jury by the court and not reduced to writing constitutes error and is "sufficient cause for the reversal of the judgment rendered" in the trial court. *Id.* Furthermore, the alleged instruction was given without notice to the parties or their counsel, which would constitute error under Neb. Rev. Stat. § 25-1116 (Reissue 1989). If during deliberations jurors "desire to be informed as to any part of the law arising in the case, they may request the officer to conduct them to the court where the information upon the point of law shall be given . . . in the presence of or after notice to the parties or their counsel." § 25-1116. When it becomes necessary for the court to give further instruction to the jury while it is deliberating, the proper practice is to call the jury into open court and to give any additional instructions in writing in the presence of the parties or their counsel. *Nebraska Depository Inst. Guar. Corp. v. Stastny*, 243 Neb. 36, 497 N.W.2d 657 (1993).

Violations of the procedural guidelines of §§ 25-1115 and 25-1116 do not result in an automatic reversal of judgment and order for a new trial. After a jury has retired to deliberate, it is error to give an instruction to the jury out of the presence of the parties or their counsel, but if it clearly appears that prejudice did not flow therefrom, such error is not grounds for reversal. See *In re Estate of Corbett*, 211 Neb. 335, 318 N.W.2d 720 (1982). In order for a new trial to be granted on the basis of improper communication between judge and jury, it must be shown that a substantial right of the defendant was adversely affected and that the defendant was prejudiced thereby. See *State v. Mahlin*, 236 Neb. 818, 464 N.W.2d 312 (1991). In

*Mahlin*, the Supreme Court quoted its own rule from *State v. White*, 191 Neb. 772, 217 N.W.2d 916 (1974):

> "There is reversible error if the record affirmatively shows that defendant has been prejudiced by private communication between the trial court and jurors, and a new trial should be granted where the record is silent as to a possibility of prejudice, although reversal is not required if the record affirmatively shows communication had no tendency to influence the verdict."

*Mahlin*, 236 Neb. at 823, 464 N.W.2d at 316.

Improper communication between judge and jury is not per se prejudicial error, but the State bears the burden of *disproving* prejudice if a criminal defendant shows that there was improper communication between judge and jury. See *Simants v. State*, 202 Neb. 828, 277 N.W.2d 217 (1979) (holding that if in a criminal case improper communication between a juror and a nonjuror is shown, a rebuttable presumption of prejudice arises and the burden is on the State to prove that the communication was not prejudicial).

In *Mahlin*, the Supreme Court affirmed the trial court's denial of the defendant's motion for new trial because "the defendant presented no direct evidence that a communication in fact occurred and, apparently, made no effort to ascertain the facts by questioning court personnel or members of the jury." *Mahlin*, 236 Neb. at 823-24, 464 N.W.2d at 316. In the case at bar, Owen presented direct evidence, in the form of a juror affidavit, of an alleged improper communication.

We do not have sufficient information to render an appellate decision on this matter. We cannot find reversible error on the record before us because the record does not affirmatively show whether an additional oral instruction on reasonable doubt was given, not to mention whether it was prejudicial to Owen. Yet, we cannot ignore the fact that the juror affidavit presented by Owen raises the possibility of an improper communication that could have prejudiced Owen's substantial right to a fair trial. If a further instruction on reasonable doubt was given, Owen should have been notified so that a proper objection could have been raised had Owen believed that the State's burden of proof was not being defined properly by the

court.

A motion requesting a judge to recuse himself on the grounds of bias or prejudice is addressed to the discretion of the judge, and an order overruling such a motion will be affirmed on appeal unless the record establishes bias or prejudice as a matter of law. *State v. Shepard*, 239 Neb. 639, 477 N.W.2d 567 (1991). The record reflects five instances during the hearing of the motion for new trial where defense counsel moved for the trial judge to recuse himself and allow another judge to preside over an evidentiary hearing to resolve the issue of an alleged improper further instruction on reasonable doubt. The trial judge denied the allegation in the affidavit that he provided a further, spontaneous instruction on reasonable doubt, and he refused to recuse himself and allow an evidentiary hearing on this matter. We cannot resolve this matter until the trial judge testifies in the record as to what, if anything, he said in response to the jury's inquiry about reasonable doubt. Therefore, we find that the judge's decision not to recuse himself and allow an evidentiary hearing constituted an abuse of discretion because it deprived Owen of her substantial right to determine whether a further instruction on the State's burden of proof had been given without her knowledge and, if so, whether such conduct was prejudicial.

### (b) Dictionary Definitions

One of the juror affidavits stated that several jurors brought written dictionary definitions of the words "reasonable" and "doubt" into the jury room during deliberations and recited those definitions for the other jurors.

A jury is not to consider any extraneous evidence in reaching its decision. See *Priest v. McConnell*, 219 Neb. 328, 363 N.W.2d 173 (1985). In *Priest*, jurors deliberating in a wrongful death action consulted a dictionary for definitions of the terms "negligence," "contributory," and "preponderance," and one of the jurors stated in a posttrial affidavit that the jury had relied on the dictionary definitions in determining the plaintiff's burden of proof. The trial court had failed to properly instruct the jury on the terms for which the jurors sought dictionary definitions. The jury rendered a verdict in

favor of the defendant. The plaintiff's motion for new trial based on jury misconduct was overruled, and the plaintiff appealed. Before announcing its holding, the Supreme Court noted that while the jury's use of dictionary definitions constituted misconduct, only misconduct prejudicial to a party's substantial rights justifies reversal of a judgment. The Supreme Court then reversed the judgment and remanded the cause for a new trial. The court found that the plaintiff might have been prejudiced by the combination of the failure of the trial court to properly instruct the jury on critical terms and the jury's resort to dictionary definitions to fill in the blanks.

The case before us differs from *Priest* in that the trial judge in the instant case did give a proper jury instruction on reasonable doubt. However, the possibility that the jury might have relied on dictionary definitions of the words "reasonable" and "doubt" in determining the State's burden of proof raises a legitimate question of potential prejudice to Owen.

On the matter of juror misconduct, the Nebraska Supreme Court has stated that

> [w]hen an allegation of misconduct is made, and is supported by a showing which tends to prove that serious misconduct occurred, the trial court should conduct an evidentiary hearing to determine whether the alleged misconduct actually occurred. If it occurred, the trial court must then determine whether it was prejudicial to the extent the defendant was denied a fair trial. If the trial court determines that the misconduct did not occur, or that it was not prejudicial, *adequate findings should be made so that the determination may be reviewed.*

(Emphasis supplied.) *State v. Steinmark*, 201 Neb. 200, 204-05, 266 N.W.2d 751, 754 (1978). See, also, *State v. McDonald*, 230 Neb. 85, 430 N.W.2d 282 (1988). In *Hunt v. Methodist Hosp.*, 240 Neb. 838, 849, 485 N.W.2d 737, 745 (1992), the Supreme Court reiterated the requirement that whatever the outcome of the evidentiary hearing on alleged jury misconduct, the trial court "must make adequate findings so that the ruling may be reviewed."

On the issue of whether the alleged jury misconduct in connection with the dictionary definitions of the words

"reasonable" and "doubt" was prejudicial, the burden of proof rests with Owen. In order for a new trial to be granted because of juror misconduct, the party claiming the misconduct has the burden to show by clear and convincing evidence that prejudice has occurred. *Hunt v. Methodist Hosp., supra*; *State v. Benitez*, 1 Neb. App. 310, 493 N.W.2d 353 (1992). The subject matter of the complaining party's offer of proof is carefully circumscribed by statute. Neb. Rev. Stat. § 27-606(2) (Reissue 1989) prohibits a juror from testifying to the effect of evidence upon his or her mental processes or emotions during deliberations. See *Loving v. Baker's Supermarkets*, 238 Neb. 727, 472 N.W.2d 695 (1991). However, § 27-606(2) allows a juror to testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention during deliberations. *Loving v. Baker's Supermarkets, supra.* Consequently, the party trying to prove prejudicial jury misconduct faces a paradox. Affidavits about exposure to extraneous prejudicial information are admissible under § 27-606(2), yet the rule precludes juror testimony to establish that the extraneous prejudicial information actually entered into the verdict. *Loving v. Baker's Supermarkets, supra.* Therefore, the question of whether prejudice resulted from jury misconduct must be resolved by the trial court's drawing reasonable inferences as to the effect of the extraneous information on an average juror. *Id.* In making its determination, the trial court must apply the following test:

> [E]xtraneous material or information considered by a jury may be deemed prejudicial without proof of actual prejudice if the material or information relates to an issue submitted to the jury and there is a reasonable possibility that the extraneous material or information affected the verdict to the detriment of a litigant.

*Id.* at 737, 472 N.W.2d at 701.

We face the same impediment to review on this issue that we faced in the matter of the alleged further jury instruction on reasonable doubt. We are unable to properly review the question of whether the jury's alleged resort to dictionary definitions prejudiced Owen because the trial court neglected to conduct the type of evidentiary hearing that is required under

Nebraska law in a situation of this type. Owen made a showing, in the form of a juror affidavit, of potentially serious misconduct by the jury. Under *Steinmark* and *McDonald*, an evidentiary hearing should have been held.

### (c) *Allen* Charge

Another of the juror affidavits stated that midway through the second day of deliberations the jury foreman sent word to the judge that the jury was deadlocked. According to the affiant, the judge replied orally through the bailiff that the jurors should continue deliberating because, given the length of the trial, it was too soon to abandon the effort to reach a verdict.

A directive from the court to a deadlocked jury to keep deliberating is commonly called an "*Allen* charge." See *State v. Garza*, 185 Neb. 445, 176 N.W.2d 664 (1970) (discussing the charge given to a deadlocked jury to continue deliberating in ·*Allen v. United States*, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896)). If it is true that the judge delivered to the jury an *Allen* charge orally and without notice to the parties or their counsel, such a charge would have violated §§ 25-1115 and 25-1116 and the State would bear the burden of proving that Owen was not prejudiced by the improper communication between judge and jury. See *Simants v. State*, 202 Neb. 828, 277 N.W.2d 217 (1979).

Although it proved to be unsupported by competent evidence, the allegation in *Mahlin* concerning improper communication between the judge and jury without the knowledge of either the prosecution or the defense is similar to the allegation made by Owen in the case before us. Defense counsel in *Mahlin* alleged that the jury had sent written statements and questions to the judge via the bailiff, including a statement that the jury could not reach a verdict on one of the counts against the defendant. Defense counsel went on to allege that the judge's responses were conveyed to the jury verbally by the bailiff without notice to the parties at any time during the communication between judge and jury. According to Owen, we are confronted in this case with a similar scenario of alleged off-the-record communication between judge and jury. Owen's

allegation is supported by an affidavit from a juror, which makes her allegation more meritorious than that made in *Mahlin*, where the allegation of improper communication was not supported by a juror affidavit, but, instead, was based solely on the affidavit of defense counsel.

As was the case with the alleged improper reasonable doubt instruction and the dictionary definitions, we are not able to engage in meaningful review of the misconduct alleged on appeal because the record does not contain adequate findings regarding the allegation of misconduct. The record does not include findings on the following questions: "Did the alleged misconduct occur?" and "If so, was it prejudicial to Owen?"

We cannot ignore the juror affidavit alleging what might be construed as an off-the-record *Allen* charge. However, we are not prepared to accept the affidavit alone as uncontrovertible proof that such a charge was given. Even if such a charge was given in violation of §§ 25-1115 and 25-1116, we cannot determine whether the charge was prejudicial to Owen until we know exactly what the judge said to the jury in the alleged charge. If the charge to keep deliberating was given, we cannot tell from the record whether the charge rose to the level of a peremptory order directing an agreement, thereby invading the province of the jury and depriving Owen of her constitutional right to a decision by an impartial and uncoerced jury, or whether the charge, instead, was merely an innocuous explanation to the jurors that it was too early to settle for a hung jury because, given the length of the trial, they had not been deliberating very long. See *State v. Garza, supra*. See, also, *Potard v. State*, 140 Neb. 116, 299 N.W. 362 (1941). The allegation of an improper *Allen* charge was further reason why the trial judge should have recused himself from the hearing on the motion for new trial. Another judge should have been allowed to conduct an evidentiary hearing and make the necessary findings concerning the alleged improper charge to the jury.

## V. CONCLUSION

We affirm the judgment of the trial court on all matters properly raised on appeal except Owen's motion for new trial.

We express no opinion as to whether the alleged acts of misconduct in connection with jury deliberations occurred or, if they occurred, whether they were prejudicial to Owen. We simply point out that under Nebraska law, when allegations of serious misconduct affecting jury deliberations are supported by juror affidavits, those allegations may not be disposed of in summary fashion.

We vacate the order of the trial court denying Owen's motion for new trial and remand this cause to the trial court with directions that a judge other than the trial judge rule on the motion for new trial after conducting an evidentiary hearing on that portion of the motion alleging improprieties during jury deliberations by the jury and by the trial judge.

We direct the judge presiding over the hearing on the motion for new trial to incorporate into the ruling on the motion his or her findings on the following issues: (1) whether dictionary definitions of the words "reasonable" and "doubt" were improperly brought to the jury's attention during deliberations and, if so, whether the presentation of the definitions was prejudicial to Owen; (2) whether, without notice to the parties or their counsel and without doing so in writing, the judge gave an improper further instruction on reasonable doubt to the jury during deliberations and, if so, whether the instruction was prejudicial to Owen; and (3) whether, without notice to the parties or their counsel and without doing so in writing, the judge delivered an *Allen* charge directing the jurors to continue deliberating even though they appeared to be deadlocked and, if so, whether the charge was prejudicial to Owen.

AFFIRMED IN PART, AND IN PART VACATED
AND REMANDED WITH DIRECTIONS.