KATHRYN N. LOVING, APPELLANT, V. BAKER'S SUPERMARKETS, INC., A NEBRASKA CORPORATION, APPELLEE.

472 N.W.2d 695

Filed July 26, 1991.   No. 88-1014.

Steven M. Renteria, of Welsh & Sibbernsen, for appellant.

Thomas J. Culhane and Deborah D. McLarney, of Erickson & Sederstrom, P.C., for appellee.

HASTINGS, C.J., WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ., and COLWELL, D.J., Retired.

SHANAHAN, J.

In her negligence action against Baker's Supermarkets, Inc. (Baker's), Kathryn N. Loving claimed damages from her fall on the floor of a Baker's supermarket. After a verdict for Baker's, the court overruled Loving's motion for new trial; hence this appeal in which Loving's primary contention is misconduct by the jury in reaching the verdict.

## LOVING'S SLIP AND FALL

While Timothy Jones, a Baker's employee, was carrying out groceries for a supermarket patron, he dropped some glass bottles of beer on the floor near the supermarket's checkout area. To clean up the beer and broken bottles, Jones got a mop, bucket, and two yellow signs with the inscription "caution wet floor." Jones put one "caution" sign in the center of the spill and the other at the edge of the spill. In leaving the store, several customers walked around Jones at the spill area.

Meanwhile, Loving and her sister, Tomi Thomas, purchased groceries at a cash register in the "express lane" near the spill area. After Loving and her sister left the express lane cash register, they saw Jones standing with his back to Loving and Thomas. As the sisters passed Jones, Loving twisted her right ankle and fell onto her knee in a "big puddle" which Loving had not seen until she was "in it." Loving then looked back at Jones, who she discovered was mopping, and saw a warning sign. According to Jones, however, he was holding the mop and facing Loving and Thomas as the two women approached the spill area. He moved aside to allow the pair to walk through the area, which he believed to be free from any residue of the dropped bottles.

Shortly after this incident, while she was still at the supermarket, Loving gave Baker's store manager her name, telephone number, and an account of the accident. From the information supplied by Loving, the manager prepared one of

Baker's "public liability claim" forms concerning Loving's accident. Loving subsequently underwent surgery for a chondral fracture of her left patella.

## LOVING'S TRIAL

In cross-examining Loving, Baker's counsel read a part of Loving's petition in which she alleged lost wages as a result of her injury, although Loving, on cross-examination, admitted that she was unemployed for the 10 years preceding the accident at Baker's. Also, Baker's counsel read into evidence interrogatory No. 13 answered by Loving:

> Please state in your own words how this accident happened. Answer: Plaintiff and her sister were walking south towards the exit. A man was mopping the floor. When plaintiff approached the man stepped back so plaintiff assumed it would be clear to walk. Plaintiff stepped down with her right foot onto a piece of glass and continued down to twist her right ankle and fell down onto the left knee.

To counteract her answer to the interrogatory, Loving testified that only after she had fallen and looked at Jones did she know that he was mopping the floor. A large diagram, exhibit 4, reflecting the floor plan at the spill area was received in evidence and marked by Loving and Jones to show their locations when Loving slipped and fell. A diagram similar to exhibit 4 appeared in the accident report which Loving had submitted to Baker's and which was marked exhibit 10 and received in evidence, but the diagram in exhibit 10 did not depict the same location of the spill or the locations of Loving and Jones. Loving testified that she attended at least three sessions for physical therapy at Immanuel Hospital. Later, a typed list of medical expenses claimed by Loving was received in evidence and showed:

1-14-88
4-23-88          IMMANUEL          161.25.

At the conclusion of Loving's testimony, the court commented to the jury, "[W]e do have some witnesses coming in apparently tomorrow and no one else is available right now, so we're going to take our evening recess . . . ." The court

admonished the jury and recessed the trial until 9:30 the next morning, when Loving's sister, Tomi Thomas, was the first witness to testify and generally corroborated Loving's testimony concerning the accident and supplied a description of Loving's disability and pain after the accident. In cross-examination of Thomas, Baker's lawyer asked whether Loving had told Thomas "what she said yesterday in court." Thomas responded: "No, she didn't." Baker's lawyer then asked Thomas: "Did you talk to her attorney?" Thomas answered: "This morning, yes." Baker's lawyer: "Did he tell you what she testified to?" Thomas: "No, he didn't." Cross-examination ended shortly thereafter. The subject of any conversation between Thomas and Loving or her lawyer was not pursued on redirect examination.

At the conclusion of the evidence, the court instructed the jury:

> [Y]ou should be governed solely by the evidence introduced before you. . . . [I]f any of you be personally acquainted with any material or particular fact not supported by the evidence, you should not consider your personal knowledge of such fact or mention it to your fellow jurors.
>
> . . . .
> . . . The law demands of you a just verdict uninfluenced by . . . considerations outside the evidence . . . .

The jury returned a verdict for Baker's.

## EXTRANEOUS MATERIAL IN JURY ROOM

After the verdict, the court and counsel learned that when the bailiff brought to the jury room those exhibits which had been received in evidence, the bailiff inadvertently included four documents which had not been received in evidence, namely, photocopies of three items—Loving's petition, Loving's answers to interrogatories, and the accident report prepared by Baker's manager—and a "Legal Pad," a note pad containing handwritten notes by Baker's lawyer. Parts of the photocopies had been bracketed, circled, or underlined in blue ink before delivery to the jury room.

The most significant markings on the first three documents

included inked underscoring in Loving's petition of the statement "because of her injuries plaintiff has lost a sum in wages and her earning capacity has been permanently decreased and impaired"; bracketing of Loving's answer to interrogatory No. 13, containing her description of the accident; and a hand-drawn illustration of the spill site, inserted on the accident report.

The fourth item delivered to the jury, the note pad, contained handwritten notes made by counsel for Baker's regarding testimony from various witnesses. Apparently outlining his intended cross-examination of Loving, Baker's counsel wrote on the note pad a list of points actually mentioned during his cross-examination of Loving, for example, "wages" in reference to the petition, "man mopping floor," "Tim [Jones] back—yet steps aside . . . place was busy," and "says nothing about lack of signs." In other notes pertaining to Loving, but without reference to testimony from Loving or any other witness, Baker's counsel wrote "take extra caution," "plan lawsuit," "exagerate [sic]—p.t. [physical therapy]—$120." Regarding Loving's sister, Baker's counsel wrote:

Tomi Thomas—
-never discussed w/ sister
-   "       "      " atty—Steve a better atty.

## LOVING'S MOTION FOR NEW TRIAL

In conjunction with her motion for new trial, Loving claimed jury misconduct as a result of the jury's consideration of the documents which were not received in evidence. See Neb. Rev. Stat. § 25-1142(2) (Reissue 1989) (jury misconduct as a ground for a new trial). To support her motion, Loving offered the four items in question—the three photocopies and legal pad—and affidavits of three jurors, who stated that each of them had "considered" those items during jury deliberations. A fourth juror, by affidavit, stated that the documents in question were "read aloud" during the jury's deliberations and that the affiant had "considered" those documents during deliberations in Loving's case. See Neb. Rev. Stat. § 25-1144 (Reissue 1989) (affidavits required to support new trial motion based on jury misconduct). Baker's counsel objected to the jurors' affidavits

in relation to Neb. Evid. R. 606(2), Neb. Rev. Stat. § 27-606(2) (Reissue 1989), and argued that to the extent the affidavits showed "what effect these exhibits had on [the jurors] . . . they are not receivable." The district court received the juror affidavits and subsequently overruled Loving's motion for new trial.

## ASSIGNMENT OF ERROR

Loving's main contention is that the trial court abused its discretion by denying Loving a new trial in view of the jury's consideration of documents which were not introduced into evidence at Loving's trial.

## STANDARD OF REVIEW

"A motion for new trial is addressed to the discretion of the trial court. In the absence of an abuse of discretion, a trial court's disposition of a motion for new trial will be upheld on appeal." *DeCamp v. Lewis*, 231 Neb. 191, 200, 435 N.W.2d 883, 888 (1989).

## JURY MISCONDUCT AS GROUND FOR NEW TRIAL

Loving argues that the jury's consideration of the documents in question constituted "misconduct of the jury," a ground for a new trial in accordance with § 25-1142(2).

"Misconduct of the jury," used in § 25-1142(2), does not necessarily mean a jury's bad faith or malicious motive, but means a jury's violation of, or departure from, an established rule or procedure for production of a valid verdict. See, *Chicago, St. P., M. & O. R. Co. v. Deaver*, 45 Neb. 307, 63 N.W. 790 (1895); *Cerf v. Smolderen*, 39 N.J. Super. 222, 120 A.2d 793 (1956); *Railroad v. Green*, 100 Tenn. 238, 47 S.W. 221 (1898).

## INQUIRY INTO A VERDICT'S VALIDITY

Rule 606(2) of the Nebraska Evidence Rules states:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or

concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him indicating an effect of this kind be received for these purposes.

As this court noted in *Ellis v. Far-Mar-Co*, 215 Neb. 736, 744, 340 N.W.2d 423, 427 (1983), Rule 606(2) "specifically provides for inquiry into the validity of a verdict when extraneous prejudicial information may have been improperly brought to the jury's attention."

In *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 455-57, 412 N.W.2d 56, 77-78 (1987), we stated:

In Neb. Evid. R. 606(2), the important phrase is "extraneous prejudicial information," and within that phrase the crucial word is *extraneous*, which means "existing or originating outside or beyond: external in origin : coming from the outside . . . brought in, introduced, or added from an external source or point of origin." Webster's Third New International Dictionary, Unabridged 807 (1981).

. . . .

. . . Neb. Evid. R. 606(2) permits use of a juror's affidavit to establish that the jury considered prejudicial information emanating from a source other than evidence presented at trial. However, it is just as clear that Neb. Evid. R. 606(2) prohibits a juror's affidavit to impeach a verdict on the basis of jury motives, methods, misunderstanding, thought processes, or discussions during deliberations, which enter into the verdict.

(Emphasis in original.) Accord, *State v. Meyer*, 236 Neb. 253, 460 N.W.2d 656 (1990); *Zeeb v. Delicious Foods*, 231 Neb. 358, 436 N.W.2d 190 (1989); *State v. Woodward*, 210 Neb. 740, 316 N.W.2d 759 (1982).

A graphic illustration of a jury's consideration of extraneous prejudicial information is found in *Klein v. Wilson*, 167 Neb. 779, 94 N.W.2d 672 (1959), a negligence action concerning an

automobile-truck accident. In *Klein,* two jurors conducted experiments to ascertain the stopping distance of a vehicle and, during jury deliberations, informed the other jurors about the results of the experiments. The *Klein* court concluded that "the making of statements of fact by jurors which are not in evidence is error and is to be condemned." 167 Neb. at 788, 94 N.W.2d at 678. Other Nebraska decisions illustrating a jury's consideration of extraneous prejudicial information include *Kremlacek v. Sedlacek,* 190 Neb. 460, 209 N.W.2d 149 (1973) (during trial, a juror inspected the accident site involved in a motor vehicle negligence action and reported his observations to the other jurors), and *De Porte v. State Furniture Co.,* 129 Neb. 282, 261 N.W. 419 (1935) (juror's imparting to other jurors information claimed to have been obtained by the juror's visit to the accident site in a premises liability action).

Thus, Rule 606(2) does not equate with, or govern, grounds for a new trial, but indicates and governs the character or type of information properly used in determining whether juror misconduct has occurred in reference to a verdict. *Rahmig v. Mosley Machinery Co., supra.*

Regarding "misconduct of the jury," we stated in *Norquay v. Union Pacific Railroad,* 225 Neb. 527, 543, 407 N.W.2d 146, 157 (1987): "As a ground for setting aside a verdict in view of alleged misconduct by a juror, one must show that the questioned conduct entered into a verdict prejudicial or adverse to the party alleging such misconduct." Accord, *Auer v. Burlington Northern RR. Co.,* 229 Neb. 504, 428 N.W.2d 152 (1988); *Ellis v. Far-Mar-Co, supra; State v. Woodward, supra; Zancanella v. Omaha & C. B. Street R. Co.,* 96 Neb. 596, 148 N.W. 158 (1914).

However, since Rule 606(2) precludes and excludes testimony, including a juror's affidavit, concerning motives, methods, misunderstanding, thought processes, or discussions by a jury in reaching a verdict, Rule 606(2) also precludes juror testimony to establish that extraneous prejudicial information actually entered into the verdict. See *Rahmig v. Mosley Machinery Co., supra.* See, also, *Wiser v. People,* 732 P.2d 1139, 1141-42 (Colo. 1987):

Under [Rule 606(2)], affidavits from jurors about

exposure to extraneous information or influences are admissible. The rule, however, precludes admission of the only evidence relevant to prove whether a defendant was prejudiced as a result of the improper contact. . . .

An approach that avoids the problems arising under [Rule 606(2)] requires the trial court to determine what effect juror misconduct would have had on a typical jury.

See, also, *Lanza v. Poretti*, 537 F. Supp. 777 (E.D. Penn. 1982) (whether prejudice resulted from an unauthorized jury experiment must be resolved by a court's drawing reasonable inferences regarding the effect of jury misconduct in considering the experiment); *Simon v. Kuhlman*, 488 F. Supp. 59 (S.D.N.Y. 1979) (whether prejudice resulted from the jury misconduct must be resolved by the court by drawing reasonable inferences about the effect of the misconduct on an average juror). See, further, J. Friedenthal, M. Kane & A. Miller, Civil Procedure § 12.5 at 567 (1985) ("prejudice will have to be inferred since [Rule 606(2)]) precludes any testimony regarding the effect this extraneous information may have had on the jury"); Mueller, *Jurors' Impeachment of Verdicts and Indictments in Federal Court Under Rule 606(b)*, 57 Neb. L. Rev. 920, 963 (1978) ("the question whether [jury] misconduct affected the verdict cannot be resolved by asking jurors why they voted as they did . . . . The question whether prejudice resulted must be resolved by drawing inferences"). Referring to Fed. R. Evid. 606(b), after which Neb. Evid. R. 606(2) was patterned, Wright and Gold state:

Rule 606(b) creates two exceptions, permitting testimony "on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." . . .

. . . .

While it is clear that a juror may not testify under either exception unless the information or influences affected the jury's decision, it is not always clear how such prejudice may be proven. This is because most courts preclude jurors from testifying as to the effect on their verdict of extraneous information or outside influence.

This position is based on the language of Rule 606(b) precluding testimony concerning "the effect of anything upon [a juror's] mind or emotions as influencing him to assent to or dissent from the verdict." As a result, it is impossible to prove prejudice through direct evidence since the only potential witnesses are precluded from testifying that prejudice occurred. . . .

. . . .

. . . [Some] courts resolve the prejudice issue through a common-sense inquiry into the likely effect of the information or influences on the average juror. Under this approach, the inquiry is whether there is a "reasonable possibility" the extraneous information or outside influence effected the verdict. . . .

. . . [T]he court must attempt to draw inferences as to the probable effects of the extraneous information or outside influence in light of objectively apparent facts about the context in which those matters came to the jury's attention.

27 C. Wright & V. Gold, Federal Practice and Procedure § 6075 at 442, 464, 468-69 (1990).

Thus, in *Ellis v. Far-Mar-Co*, 215 Neb. 736, 340 N.W.2d 423 (1983), we reaffirmed the recognized rule that prejudice from jury misconduct in considering extraneous information, as a ground for setting aside a verdict, may be inferentially established. See, also, *Schwank v. County of Platte*, 152 Neb. 273, 40 N.W.2d 863 (1950); *Wessel v. Bishop*, 76 Neb. 74, 107 N.W. 220 (1906).

Various courts have expressed a test for determining whether prejudicial extraneous information has entered a verdict. In *Bellows Falls v. State Highway Board*, 123 Vt. 408, 414, 190 A.2d 695, 699 (1963), the court stated: "[T]he test is not whether the irregularity actually influenced the result, but whether it had the capability of prejudicing the verdict." Also, as the court noted in *Kirby v. Rosell*, 133 Ariz. 42, 45, 648 P.2d 1048, 1051 (1982): "[E]xtraneous material considered by the jury may be deemed prejudicial without proof of actual prejudice if it relates to the issues of the case and there is a reasonable possibility of prejudice." See, also, *Sayih v.*

*Perlmutter,* 561 So. 2d 309 (Fla. App. 1990) (generally, prejudice exists in delivering to jury room an item not in evidence when the item is of such character as to influence the jury); *United States v. Vasquez,* 597 F.2d 192 (9th Cir. 1979) (reasonable possibility that extrinsic material, such as a court file for the case being tried, was inadvertently left in the jury room and could have affected the verdict); *Lanza v. Poretti, supra* (extraneous information, e.g., a jury experiment, could create a reasonable possibility of prejudice); *Wiser v. People,* 732 P.2d 1139 (Colo. 1987) (most courts have decided that the relevant question is whether there is a reasonable possibility that extraneous contact or influence affected the verdict to the detriment of a litigant). See, further, M. Graham, Handbook of Federal Evidence § 606.2 (3d ed. 1991) (verdict will be set aside if there is a reasonable possibility that extraneous influence or information affected the verdict). Therefore we conclude, and now hold, that extraneous material or information considered by a jury may be deemed prejudicial without proof of actual prejudice if the material or information relates to an issue submitted to the jury and there is a reasonable possibility that the extraneous material or information affected the verdict to the detriment of a litigant.

We now examine Loving's appeal in terms of inferentially established prejudice from the jury's consideration of extraneous information and whether there is a reasonable possibility that the information affected the verdict against Loving.

Although Loving's petition, her answers to interrogatories, and the accident report were extraneous documents inasmuch as those items were never received in evidence and, therefore, should not have been delivered to the jury room, the jury's consideration of those documents, under the circumstances, does not rise to the level of prejudice which warrants setting aside the verdict. We note that each of the documents in question contained information presented to the jury through the introduction of evidence in the course of Loving's trial. For instance, on cross-examination, Loving admitted that she was unemployed when the accident occurred and had been unemployed for the 10 years immediately preceding the

accident. The factual content of the accident report, exhibit 10, including its diagram, was extensively explored by Loving's lawyer and counsel for Baker's. Also, the spill site, hand illustrated on the photocopy inadvertently delivered to the jury room, substantially corresponded with the illustration drawn on exhibit 4, the large diagram received in evidence. Use of Loving's answer to interrogatory No. 13 was an aspect of counsel's cross-examination of Loving, namely, her admission that she had seen "[a] man [later identified as Timothy Jones] mopping the floor. When [Loving] approached the man stepped back so [Loving] assumed it would be clear to walk." Thus, the content of the documents coincided with evidence adduced during Loving's trial.

True, circling, underscoring, or bracketing particular parts of the documents might emphasize or reiterate information already supplied to the jury through the adduction of evidence, but we are unable to conclude that the emphasis supplied or reiteration deprived Loving of her right to a fair trial in her negligence action. See, *Britt v. West Coast Cycle*, 198 Ga. App. 525, 402 S.E.2d 121 (1991) (sending copy of bad check to the jury room in a suit on an account did not require reversal, since conclusive admissions with respect to the check were part of the evidence); *Campbell v. City of Mishawaka*, 422 N.E.2d 334 (Ind. App. 1981) (notwithstanding that written jury instructions were delivered to the jury room, the verdict was upheld, since the instructions were first read in open court); *Brown v. Metropolitan Transit Authority*, 341 Mass. 690, 171 N.E.2d 869 (1961) (no reversal when a report, which was read to the jury in the opening statement but not admitted in evidence, was delivered to the jury); *Schroeder v. Lodge No. 188, I. O. O. F.*, 92 Neb. 650, 139 N.W. 221 (1912) (pleadings sent to the jury room did not result in reversal when the pleadings showed nothing more than the issues included in the statement of issues expressed by the court); *Clark v. Continental Tank Co.*, 744 P.2d 949 (Okla. 1987) (partially underlined exhibit inadvertently taken to the jury room did not require reversal, since the emphasized parts of the exhibit had been read in open court before the jury's deliberation). Thus, while the three documents in question were extraneous since

they were not among the exhibits received in evidence, the information in those exhibits was a reiteration of evidence already presented to the jury. Hence, we cannot conclude that the jury's consideration of those documents prevented a fair trial; therefore, the inadvertent delivery of the copies of Loving's petition, answers to interrogatories, and accident report, under the circumstances, is not prejudicial to such an extent that the verdict in Loving's case must be set aside.

However, the jury's considering the contents of the note pad used by Baker's lawyer is quite another matter.

In reference to Tomi Thomas, Loving's sister, the lawyer's notes reflected the following:

Tomi Thomas—
    -never discussed w/ sister
    -   "    "    " atty—Steve a better atty.

From the court's remarks at the conclusion of the first day in Loving's trial, it is a reasonable inference that Thomas was not present during the testimony of her sister. Since Thomas was an eyewitness and her testimony essentially corroborated Loving's descriptive testimony about the accident, Thomas' testimony was quite important on the liability issue and the defenses raised by Baker's, namely, assumption of risk and contributory negligence. Consequently, credible corroboration enhanced likelihood of a favorable verdict for Loving. Moreover, Thomas' testimony about Loving's injury and disability afforded a basis for a substantial verdict for Loving. The innuendo lurking in the notes by Baker's lawyer emerges in the form of the following syllogism: Before Thomas testified, a good lawyer would have reviewed Loving's testimony with Thomas, a key witness, who was not present during Loving's testimony. "Steve," Loving's lawyer, is a good attorney. Therefore, Steve would have discussed Loving's testimony with Thomas. However, Thomas denies that she "discussed" Loving's testimony with Loving's lawyer. Since it is a fact that a good lawyer would have discussed testimony with Thomas, a key witness, logic demands the conclusion that Thomas, before testifying, actually reviewed the matter with Loving's attorney and that her denial of such discussion is an untruth which renders Thomas' testimony suspect. Discredit of Thomas, as a

key witness for Loving, would certainly have been injurious to Loving's claim.

The note pad also mentioned the medical expense for physical therapy at Immanuel hospital, which had charged $161.25 for the therapy service. There was no testimony concerning the manner in which the expense for therapy service was computed. However, the notes by Baker's lawyer indicate that the bill should have been $120, that is, four therapy sessions at $30 per session, rather than the $161.25 charged by the hospital. Moreover, although Loving indicated through her testimony that the actual number of therapy sessions was as few as three, the itemization of medical expenses showed only two therapy sessions for Loving. The discrepancy between the amount due the hospital for therapy and Loving's testimony shows that the hospital bill was for some reason overstated or "exaggerated" or that Loving's knowledge about her therapy and, correspondingly, her injuries was inaccurate and, therefore, unreliable.

Further, counsel's reference on the note pad to a "plan[ned] lawsuit," when combined with the inferences provided by the lawyer's notes about physical therapy, intimated that Loving brought a lawsuit calculated to recover an inflated amount of damages for her injury.

Of course, whether the extraneous information was actually used by the jury as suggested above in connection with Thomas' testimony, the therapy expense, and the reference to a planned lawsuit is a subject of some surmise. What is not speculative is the fact that the jury actually considered the information contained in the lawyer's notes on the legal pad inadvertently sent to the jury room. For that reason, we conclude that prejudice from the jury's considering extraneous information was inferentially established with a reasonable possibility that the information affected the verdict against Loving; hence, the jury misconduct prevented a fair trial for Loving on her negligence claim against Baker's. Thus, the district court abused its discretion by denying a new trial to Loving as a result of the jury misconduct.

On the question whether to permit impeachment of a verdict, it makes no difference that the "extraneous"

matter could have been introduced into evidence. . . . The point is to insure, as far as reasonably possible, that juries will reach verdicts on the basis of information known to the parties in litigation, and to provide the party whose case is negatively affected by the data a chance to probe and rebut.

Mueller, *Jurors' Impeachment of Verdicts and Indictments in Federal Court Under Rule 606(b)*, 57 Neb. L. Rev. 920, 944 (1978).

### CONCLUSION

Although Loving raises questions about the instruction given on assumption of risk, in view of our disposition of Loving's appeal we find it unnecessary to consider Loving's question about the assumption of risk instruction.

The judgment of the district court is reversed, and this cause is remanded for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.

FAHRNBRUCH, J., concurs.