STATE OF NEBRASKA, APPELLEE,
V. ROBERT E. WILLIAMS, APPELLANT.
568 N.W.2d 246

Filed September 12, 1997. No. S-96-266.

Paula Belford Hutchinson for appellant.

Donald Stenberg, Attorney General, and J. Kirk Brown for appellee.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

CONNOLLY, J.

Robert E. Williams appeals the Lancaster County District Court's denial of his motion for postconviction relief under Neb. Rev. Stat. §§ 29-3001 to 29-3004 (Reissue 1995). We are asked to determine whether Williams was denied a fair trial because a juror used maps to check Williams' postshooting "flight path" and testified that she factored this extraneous information into her predeliberation consideration of Williams' drug- and/or alcohol-induced insanity defense.

We conclude that the district court did not err in not considering the juror's testimony or in its finding that Williams was

not prejudiced by the juror's use of the maps. Accordingly, we affirm the district court's denial of Williams' motion for post-conviction relief.

## I. BACKGROUND

### 1. CRIMES AND "FLIGHT PATH"

Sometime between 10:30 a.m. on August 10, and 1:30 a.m. on August 11, 1977, Williams shot and killed Patricia A. McGarry and sexually assaulted and killed Catherine M. Brooks in a Lincoln, Nebraska, apartment. Brooks' naked body was found with two bullet wounds behind her left ear and one in her back. Later medical examinations revealed spermatozoa in her vaginal and rectal tracts. McGarry was shot three times, once under her right ear and twice in her neck.

On August 11, at approximately 1:30 a.m., Williams drove to the Lincoln residence of George Ellis, an acquaintance. Ellis testified that Williams stayed at his residence for approximately 45 to 50 minutes and that he observed nothing out of the ordinary about Williams. Williams then went home and slept. Between 9:30 and 9:45 a.m., Williams drove to the Lincoln residence of a woman who was an acquaintance. Williams entered the woman's residence under false pretenses and remained there until approximately 4 p.m. While Williams was in the woman's residence, he sexually assaulted her on numerous occasions, physically assaulted her with a handgun, slept, and had her prepare him two meals. Other than for the physical and sexual assaults, the woman described Williams' demeanor and physical characteristics as being normal.

At approximately 5 p.m., Williams was observed with his car at a gas station in Fremont, Nebraska. Fremont was described at trial as being north of Lincoln. At the gas station, Williams was seen by two people, each of whom did not notice anything unusual in his mannerisms or conduct.

At 10:15 p.m., a deputy sheriff of Cherokee City, Iowa, which is located approximately 140 miles northeast of Omaha, Nebraska, observed Williams' car abandoned and the motor running in a county park known as Martin's Access. Sometime between 11:30 p.m. on August 11, and 6 a.m. on August 12, a car and two blankets belonging to Jack and Mary Ann Montgomery

were stolen from their farm. Martin's Access is on the same highway as the Montgomery farm, and the distance between the two is 1½ miles by road and less than 1 mile cross-country. Williams' checkbook was found in the Montgomery driveway. The Montgomery car was discovered abandoned in a ditch at 10 a.m. on August 12, 1 mile east of Cornell, Iowa. Cornell is approximately 20 miles northeast of the Montgomery farm.

Around 7:15 a.m. on August 12, Elbert Bredvick saw Williams approaching his farmyard, which is approximately 5 miles southwest of where the Montgomery car was discovered. Williams had two blankets rolled on his back, said he was lost, and asked for directions to the closest town. Bredvick observed nothing unusual about Williams and described him as "perfectly normal." Bredvick directed Williams west to Sioux Rapids, Iowa.

At approximately 12:20 p.m. on August 12, Wayne Rowe discovered his wife's naked dead body in their farmhouse. She had been shot in her side and back with a shotgun and in her neck with a .22-caliber bullet. Later examination established that Rowe's wife had also been sexually assaulted.

The Rowe farmhouse is located approximately one-half mile west of the Bredvick farmhouse down the same road which Bredvick directed Williams. The Rowes' car was missing and was later discovered in St. Paul, Minnesota. The blankets which Bredvick had seen in Williams' possession were found on the Rowes' property. On August 13, at around 1:30 p.m., Walter Behun was working in his yard in Fridley, Minnesota, a suburb of St. Paul, when he saw Williams pointing a gun at him. Williams abducted Behun and had Behun drive him to St. Paul. Behun drove Williams to a railroad freight yard, where Behun was left bound in a caboose. Williams took Behun's car, which was later found in the Como Avenue and Dale Avenue area in St. Paul. Except for pointing a gun at him and abducting him, Behun observed Williams to be normal.

At approximately 3 p.m. on August 13, Katherine Billings was leaving a liquor store at the intersection of Como Avenue and Dale Avenue in St. Paul, when she was kidnapped by Williams. Prior to driving away with Billings in her car, Williams shot her in the arm and behind her left ear. Billings

was taken to a secluded rural area where she was sexually assaulted, bound, and left for dead.

On August 14, Williams arrived by car in Chicago, Illinois. He stayed in Chicago until late August 17, when he jumped on a train heading west. He arrived in Lincoln either late on August 17 or early on August 18 and was arrested at 4 a.m. on August 18, 1977.

## 2. Trial and Sentencing

Williams was charged with two counts of first degree murder for the killings of McGarry and Brooks and with the first degree sexual assault of Brooks. Williams confessed to the killings but pled not guilty by reason of insanity or mental derangement. Jury instruction No. 9 stated:

> The defendant contends that he was insane or mentally deranged at the time he is alleged to have committed the offenses charged in the Information. Insanity is a defense recognized by law and the evidence relating thereto should be considered by you and weighed the same as any other evidence.
>
> The burden is upon the State to establish the fact of defendant's sanity beyond a reasonable doubt.
>
> If from all of the evidence you are convinced beyond a reasonable doubt that the defendant committed the act or acts charged and that at the time of the commission of the alleged crime he was of sufficient mental capacity:
>
> 1. To understand what he was doing and the nature and quality of his act;
>
> 2. To distinguish between right and wrong with respect to it; and
>
> 3. To know that such act was wrong and deserved punishment, then the defendant would be legally responsible for his acts and you should return a verdict of "guilty," although you might find that at the time he was suffering from some degree of insanity or impairment of the mind.
>
> If from the evidence or lack of evidence in this case a reasonable doubt is raised in your minds as to the defendant's mental capacity at the time of the commission of the alleged crime:

1. To understand what he was doing and the nature and quality of his act; or

2. To distinguish between right and wrong with respect to it; or

3. To know that such act was wrong and deserved punishment,

it is your duty to find the defendant "not guilty by reason of insanity."

This instruction did not require the jury to find that Williams was suffering from a mental disease (defect, disorder) at the time of the shootings in order to find that he was insane. Two psychiatrists, Emmet N. Kenney, M.D., and John Baldwin, M.D., testified for the State that although Williams suffered from a personality disorder, he was not insane at the time of the shootings. More specifically, both of the State's psychiatrists testified that at the time of the shootings, Williams had sufficient mental capacity (1) to understand what he was doing, (2) to understand the nature and quality of his acts, (3) to distinguish between right and wrong with respect to his acts, (4) to know that his acts were wrong and deserved punishment, and (5) to turn over in his mind his acts before doing them.

Two psychiatrists, Beverley T. Mead, M.D., and J. Whitney Kelley, M.D., testified for the defense that at the time of the shootings, Williams suffered from a paranoid state beyond that of a personality disorder. Dr. Mead testified that Williams' perception of reality and his judgment were seriously impaired, but opined that at the time of the shootings Williams knew what he was doing, knew that his acts were wrong, and knew right from wrong. Dr. Kelley, the only non-board-certified psychiatrist of the four experts, testified that Williams' thinking process was distorted and that he would have known that his actions were wrong only if he had taken time to think.

Williams stated that he was under the influence of alcohol, marijuana, LSD, and PCP at the time of the shootings. Both of Williams' experts agreed that depending on the quantity and quality of PCP and LSD ingested, the effects of those drugs can last for days. Jury instruction No. 10 stated:

Ordinarily, voluntary drug or alcohol intoxication is no justification or excuse for crime; but excessive drug or

alcohol intoxication by which a person is wholly deprived of reason may prevent deliberation, premeditation or having the intent charged.

If you find that the defendant was intoxicated with drugs or alcohol, that fact should be considered by you, together with all the facts and circumstances in evidence, for the purpose of determining whether or not you have a reasonable doubt that defendant was at the time in question capable of deliberation, premeditation or having the intent charged.

Williams was found guilty on all three counts and was sentenced to death on each of the two murder counts and to imprisonment for not less than 8⅓ years nor more than 25 years on the sexual assault count.

### 3. PROCEDURAL HISTORY

Following the verdict, Williams filed a motion for new trial alleging numerous irregularities, including denial of "a fair and impartial trial and due process of law by the misconduct of certain jurors during trial of [his case]." The sole basis for the motion for new trial's generic allegation of juror misconduct was telephone conversations that one of Williams' trial counsel had with jurors which related to the publication of the jurors' names in a local newspaper. In denying Williams' motion for new trial, the district court found that "there was no misconduct of any juror during the trial."

On direct appeal, Williams raised numerous errors, none of which included juror misconduct and all of which were found to be without merit. See *State v. Williams*, 205 Neb. 56, 287 N.W.2d 18 (1979), *cert. denied* 449 U.S. 891, 101 S. Ct. 255, 66 L. Ed. 2d 120 (1980). In his two previous unsuccessful postconviction actions, Williams did not raise juror misconduct as a basis for relief. See, *State v. Williams*, 224 Neb. 114, 396 N.W.2d 114 (1986); *State v. Williams*, 217 Neb. 539, 352 N.W.2d 538 (1984). Williams also failed in an attempt to obtain federal habeas corpus relief. *Williams v. Clarke*, 40 F.3d 1529 (8th Cir. 1994), *cert. denied* 514 U.S. 1033, 115 S. Ct. 1397, 131 L. Ed. 2d 247 (1995).

On January 25, 1995, this court issued an order setting March 22, 1995, as Williams' execution date. On March 21, Williams

filed his third attempt to obtain state postconviction relief in the district court. The district court denied Williams' request for a stay of execution in that proceeding. On March 22, in *State v. Williams*, cases Nos. S-95-295 and S-42-235, this court ordered its execution warrant withdrawn and directed the district court to conduct an evidentiary hearing as follows:

> [T]he matter is remanded to the district court for Lancaster County to promptly hold an evidentiary hearing on the petition for post conviction [relief] to determine whether the alleged [juror] misconduct actually occurred, and [if so] whether said misconduct was prejudicial to the extent that the defendant was denied a fair trial.

#### 4. Postconviction Evidentiary Hearing

At the postconviction evidentiary hearing, juror Barbara Boyce stated that at the conclusion of each day's trial testimony, she went home and journalized what had transpired. The jurors were not sequestered and were not permitted to take notes. Boyce testified on direct examination in the following manner:

Q . . . [D]id you ever look at maps during the deliberation process of the trial?

A No.

. . . .

Q At the time that you looked at the maps, and again, I'm talking before deliberations, did you look at the maps to verify how plausible it would be that a person under the influence could have executed the specific flight path that Mr. Williams did?

A As things — as testimony evolved and questions of his sanity and so forth, this was a factor in my consideration, yes.

Q And at the time that you looked at the maps — and again, I want to be very clear, I'm talking about before deliberations and during the trial portion of the evidence when the evidence was presented, what was it that you did, in fact, determine by examining the maps?

A Well, it seemed to me that — that he was — had been very quick to extricate himself from a very difficult situation. It seemed to be a relatively complicated route, to me, and that did lead me to concur with the prosecuting evi-

dence saying that — or the defense saying that — wait a minute.

That he was not impaired enough to not have known what he was doing. So it seemed that what — while there was evidence of prior drug and alcohol use, it wasn't clear to me, from the picture that was presented in all of this, how much he was actually under the influence when the crimes were committed.

. . . .

Q Was there some point during deliberations that you had told some of the other jurors that you had looked at road maps during the trial?

[The State's Neb. Evid. R. 606(2) objection here was overruled.]

. . . .

A To the best of my recollection, the only time it came up was in my questioning other jurors' assumptions about places or where they were located or how far apart they were or other things of that nature, and when I did so I mentioned that I had specific recent information from a map, and was advised by the juror — jury foreman that was inappropriate. But nothing more was made of it. It was a very inconsequential part, as far as the rest of the jury was concerned.

It was adduced during the hearing that Boyce was born in Topeka, Kansas, spent most of her grade and high school years in Lawrence, Kansas, and received a bachelor's degree in French and German from the University of Kansas and a master's degree in French from Johns Hopkins University. At the time of the trial, Boyce had lived in Lincoln for approximately 5 years. She testified on cross-examination that she "had no idea" how far Omaha was from Lincoln or whether it would take 3 or 4 days to drive to Minneapolis, Minnesota, from Lincoln. She testified that she did know the relative location of the states to one another.

At the hearing, 10 of the other 11 jurors, including the foreman, testified that they did not recall any discussion about any maps at all. One juror, Joanne Hunt Kirkpatrick, testified that she recalled Boyce expressing a concern that the jurors should

be given a map so they could trace Williams' route, but did not recall Boyce saying that she had looked at a map.

## 5. DISTRICT COURT'S ORDER

The district court found that "[b]y any stretch of the imagination, Boyce's reviewing an atlas brought extraneous material or information before at least one of the jurors." However, the court held that Williams' juror misconduct claim was procedurally barred because

Boyce's reviewing an atlas was information that was "available" to the defendant immediately upon the entry of the verdict. Whether it was readily available or actually known is not the issue. It was available. Although it was uncovered, there is no evidence that it was secreted. In fact, there is not one scintilla of evidence that any effort was made, prior to February 1995, to discover any inappropriate action by the jurors, other than the previously discussed telephone conversations of May 30, 1978, which related to publication of the jurors' names in a local newspaper.

The district court went on to state that "[r]ecognizing, however, that the Supreme Court may not agree that Boyce's renegade conduct was 'available' to the defendant, when he filed his prior postconvictions . . . the court addresses the merits of Boyce's misconduct." The district court then found, "beyond a reasonable doubt, that the misconduct of Boyce, while not condoned and, in fact, specifically condemned, was harmless error." The court reasoned:

Although the defendant's sanity was an issue before the jurors, his route from Lincoln, to Fremont, to Iowa, to Minnesota, to Illinois and back to Lincoln was not. . . .

Closely reviewing the opening statements, the trial evidence, including the experts' testimony, and the closing arguments, no argument was made nor evidence adduced that connects, or can reasonably be inferred to relate, the distances between and/or locations of Lincoln; Fremont; Martin's Access; the Montgomery farm, Cornell, Iowa; the Bredvick farm; Sioux Rapids, Iowa; the Rowe farm; Fridley, Minnesota; the Behun home; St. Paul, Minnesota; the intersection of Como Avenue and Dale Avenue; the

secluded area where Billings was driven; Chicago; and Lincoln, to the defendant's contention that he was insane or mentally deranged when he shot and killed McGarry and Brooks. The evidence and arguments made related to what happened at those locales, not to where those locales were in relation to each other or when the defendant was supposed to be there.

In considering the material or information gathered by Boyce's misconduct, the court, pursuant to NEB. REV. STAT. § 27-606(2) (Reissue 1989), does not consider Boyce's comments about what effect, if any, that material information had on her mental processes or emotions during deliberations. As the appellate court stated in *State v. Owen*, 510 N.W.2d 503, 527, (Neb. App. 1993), ". . . the question of whether prejudice resulted from jury misconduct must be resolved by the trial court's drawing reasonable inferences as to the effect of the extraneous information on an average juror."

After reviewing the record, the court finds that there is no reasonable possibility that the extraneous material or information secured by Boyce affected the jury's verdicts to the defendant's detriment. There was no actual prejudice and no reasonable possibility of prejudice to the defendant by Boyce's misconduct.

(Emphasis omitted.)

## II. ASSIGNMENTS OF ERROR

Rephrased and reorganized, Williams' assignments of error assert that the district court erred in (1) its failure to grant an evidentiary hearing on whether imprisoning a person under imminent threat of death for nearly 17 years constitutes cruel and unusual punishment and a denial of justice by due process of law, (2) its failure to grant an evidentiary hearing on whether the exclusion of African-Americans from death-sentencing issues violates the Nebraska and U.S. Constitutions, (3) its finding that the issue of juror misconduct was procedurally barred, (4) its failure to consider juror Boyce's testimony that extraneous material influenced her vote to convict, and (5) its concluding that juror Boyce's use of extraneous information did not prejudice Williams.

## III. STANDARD OF REVIEW

In a motion for postconviction relief, the defendant must allege facts which, if proved, constitute a denial or violation of his or her rights under the U.S. or Nebraska Constitution, causing the judgment against the defendant to be void or voidable. *State v. Ryan*, 249 Neb. 218, 543 N.W.2d 128 (1996).

On appeal from a proceeding for postconviction relief, the trial court's findings of fact will be upheld unless such findings are clearly erroneous. *State v. Lindsay*, 246 Neb. 101, 517 N.W.2d 102 (1994); *State v. Escamilla*, 245 Neb. 13, 511 N.W.2d 58 (1994).

Regarding questions of law, an appellate court is obligated to reach a conclusion independent of determinations reached by the trial court. *State v. Stubblefield*, 249 Neb. 436, 543 N.W.2d 743 (1996); *State v. Lynch*, 248 Neb. 234, 533 N.W.2d 905 (1995).

## IV. ANALYSIS

### 1. APPEAL LIMITED TO SPECIFIC DIRECTIONS OF REMAND ORDER

In our order dated March 22, 1995, we remanded to the district court to "determine whether the alleged [juror] misconduct actually occurred, and [if so] whether said misconduct was prejudicial to the extent that the defendant was denied a fair trial." Implicit in our order, we determined Williams' assigned errors concerning imprisoning a person under imminent threat of death for nearly 17 years and the exclusion of African-Americans from death-sentencing issues to be without merit. Also implicit in our order, we determined that Williams' juror misconduct claim was not procedurally barred.

On remand, the district court determined that the alleged juror misconduct actually occurred, but found that Williams' claim was procedurally barred or, in the alternative, that the misconduct did not prejudice Williams. When a cause is remanded with specific directions, the court to which the mandate is directed has no power to do anything but to obey the mandate. The order of the appellate court is conclusive on the parties, and no judgment or order different from, or in addition to, that directed by the appellate court can be entered by the trial

court. *Xerox Corp. v. Karnes,* 221 Neb. 691, 380 N.W.2d 277 (1986); *Gates v. Howell,* 211 Neb. 85, 317 N.W.2d 772 (1982).

Accordingly, the district court was without power to find that Williams' juror misconduct claim was procedurally barred, and we will not address Williams' assigned errors that do not pertain to his juror misconduct claim.

### 2. FAILURE TO CONSIDER BOYCE'S TESTIMONY?

Williams asserts that the district court erred in failing to consider juror Boyce's testimony that extraneous material influenced her vote to convict.

### (a) Boyce's Affidavit Testimony

Boyce's affidavit was attached to Williams' postconviction motion but was never entered into evidence at the postconviction hearing. A bill of exceptions is the only vehicle for bringing evidence before an appellate court; evidence which is not made a part of the bill of exceptions may not be considered. *Huddleson v. Abramson,* 252 Neb. 286, 561 N.W.2d 580 (1997); *State v. Bell,* 242 Neb. 138, 493 N.W.2d 339 (1992); *State v. Biernacki,* 237 Neb. 215, 465 N.W.2d 732 (1991).

> "The fact that an affidavit used as evidence in the district court was filed in the office of the clerk of the district court and made a part of the transcript is not important to a consideration and decision of an appeal of a cause to this court. If such an affidavit is not preserved in the bill of exceptions its existence or contents cannot be known by this court."

*Washa v. Miller,* 249 Neb. 941, 949, 546 N.W.2d 813, 818 (1996). See, also, *State v. Bell, supra.*

Accordingly, we will not consider the portion of Williams' assigned error concerning Boyce's affidavit testimony.

### (b) Boyce's Hearing Testimony

Boyce's testimony at the evidentiary hearing is critical to this analysis and bears repeating. On direct examination, Boyce testified in the following manner:

Q . . . [D]id you ever look at maps during the deliberation process of the trial?
A No.

. . . .

Q At the time that you looked at the maps, and again, I'm talking before deliberations, did you look at the maps to verify how plausible it would be that a person under the influence could have executed the specific flight path that Mr. Williams did?

A As things — as testimony evolved and questions of his sanity and so forth, this was a factor in my consideration, yes.

Q And at the time that you looked at the maps — and again, I want to be very clear, I'm talking about before deliberations and during the trial portion of the evidence when the evidence was presented, what was it that you did, in fact, determine by examining the maps?

A Well, it seemed to me that — that he was — had been very quick to extricate himself from a very difficult situation. It seemed to be a relatively complicated route, to me, and that did lead me to concur with the prosecuting evidence saying that — or the defense saying that — wait a minute.

That he was not impaired enough to not have known what he was doing. So it seemed that what — while there was evidence of prior drug and alcohol use, it wasn't clear to me, from the picture that was presented in all of this, how much he was actually under the influence when the crimes were committed.

. . . .

Q Was there some point during deliberations that you had told some of the other jurors that you had looked at road maps during the trial?

[The State's Neb. Evid. R. 606(2) objection here was overruled.]

. . . .

A To the best of my recollection, the only time it came up was in my questioning other jurors' assumptions about places or where they were located or how far apart they were or other things of that nature, and when I did so I mentioned that I had specific recent information from a map, and was advised by the juror — jury foreman that

was inappropriate. But nothing more was made of it. It was a very inconsequential part, as far as the rest of the jury was concerned.

Neb. Evid. R. 606(2), Neb. Rev. Stat. § 27-606(2) (Reissue 1995), states:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him indicating an effect of this kind be received for these purposes.

In its order, the district court stated, "[I]n considering the material or information gathered by Boyce's misconduct, the court, pursuant to NEB. REV. STAT. § 27-606(2) (Reissue 1989), does not consider Boyce's comments about what effect, if any, that material information had on her mental processes or emotions during deliberations." Williams asserts that this statement by the district court shows that the district court did not consider Boyce's testimony, even though it was adduced without the State's imposing any objections or motions to strike pursuant to rule 606(2).

It is generally true that if a party against whom inadmissible evidence is offered consents to its introduction, or fails to object, the party is considered to have waived whatever objection he or she may have had, and the evidence is in record for consideration just as other evidence. See, *Barks v. Cosgriff Co.*, 247 Neb. 660, 529 N.W.2d 749 (1995); *State v. Nowicki*, 239 Neb. 130, 474 N.W.2d 478 (1991). However, this court and at least one other court have indicated that trial judges should not consider evidence of jurors' mental processes during the deliberation process even in the absence of a timely objection to such evidence.

In *State v. Roberts*, 227 Neb. 489, 491, 418 N.W.2d 246, 248 (1988), the affidavit of a juror stating that she " 'did use [extraneous] information . . . to make her decision about [the defendant] being guilty' " was received into evidence without objection. This court stated that "[a]lthough the juror's affidavit was not objected to at the hearing on the motion for new trial, the trial court should not have considered it, since it obviously violated the terms of § 27-606(2)." 227 Neb. at 494, 418 N.W.2d at 250.

Likewise, in *State v. Rouse*, 290 N.W.2d 911 (Iowa 1980), a juror submitted an affidavit at the hearing on a motion for new trial that stated the jury had failed to consider the issue of intent as a necessary element of the crime of burglary. The juror testified at the hearing, without objection, that she would not have voted to convict if the element of intent had been discussed. On appeal, the defendant argued that the State waived any objection it had to the juror's testimony by failing to object at the hearing. However, the Iowa Supreme Court held that the trial court properly declined to consider the juror's testimony, "even in the absence of objection by the State," 290 N.W.2d at 917, because this type of evidence is "incompetent" on "general policy grounds," 290 N.W.2d at 916.

It is important to note that permitting litigants to attack a verdict based upon the jury's internal deliberations has long been recognized as unwise. In *McDonald v. Pless*, 238 U.S. 264, 267-68, 35 S. Ct. 783, 59 L. Ed. 1300 (1915), the Court stated:

[L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference.

The underlying policy considerations of rule 606(2) cannot be overstated. In particular, our rule advances the institutional principle that all litigation must ultimately end, discourages juror harassment by unsuccessful litigants, and promotes unhindered juror discourse. See *State v. Marhal*, 172 Wis. 2d 491, 493 N.W.2d 758 (Wis. App. 1992).

We conclude that the underlying policies in support of this state's rule 606(2) are so vital to the preservation of the jury system and so basic to the interest of justice that the courts of this state must be able to apply the rule sua sponte. Accordingly, even in the absence of a timely objection pursuant to rule 606(2), the district court did not err in not considering Boyce's testimony about what effect, if any, that material information had on her mental processes or emotions during deliberations.

### 3. PREJUDICE

Williams next asserts that the district court erred in concluding that Boyce's use of the maps did not prejudice him.

In order for a new trial to be granted because of a juror's use of extraneous information, the party claiming the misconduct has the burden to show by a preponderance of the evidence that prejudice has occurred. See *State v. Anderson*, 252 Neb. 675, 564 N.W.2d 581 (1997). Extraneous material or information considered by a jury may be deemed prejudicial without proof of actual prejudice if the material or information relates to an issue submitted to the jury and there is a reasonable possibility that the extraneous material or information affected the verdict to the detriment of a litigant. *State v. Anderson, supra; Hartley v. Guthmann*, 248 Neb. 131, 532 N.W.2d 331 (1995); *Loving v. Baker's Supermarkets*, 238 Neb. 727, 472 N.W.2d 695 (1991); *State v. Owen*, 1 Neb. App. 1060, 510 N.W.2d 503 (1993). See *State v. Messelt*, 185 Wis. 2d 254, 518 N.W.2d 232 (1994). The question of whether prejudice resulted from jury misconduct must be resolved by the trial court's drawing reasonable inferences as to the effect of the extraneous information on an average juror. *Loving v. Baker's Supermarkets, supra; State v. Owen, supra*. See, also, *U.S. v. Console*, 13 F.3d 641 (3d Cir. 1993), *cert. denied sub nom. Markoff v. United States*, 513 U.S. 812, 115 S. Ct. 64, 130 L. Ed. 2d 21 (1994); *U.S. v. Boylan*, 898 F.2d

230 (1st Cir. 1990), *cert. denied* 498 U.S. 849, 111 S. Ct. 139, 112 L. Ed. 2d 106; *U.S. v. Calbas*, 821 F.2d 887 (2d Cir. 1987), *cert. denied* 485 U.S. 937, 108 S. Ct. 1114, 99 L. Ed. 2d 275 (1988); *State v. Poh*, 116 Wis. 2d 510, 343 N.W.2d 108 (1984).

In its order, the district court found that the maps did not relate to an issue submitted to the jury and that there was no reasonable possibility that the maps affected the verdict. More specifically, the district court stated:

> Although the defendant's sanity was an issue before the jurors, his route from Lincoln, to Fremont, to Iowa, to Minnesota, to Illinois and back to Lincoln was not. . . .
>
> Closely reviewing the opening statements, the trial evidence, including the experts' testimony, and the closing arguments, no argument was made nor evidence adduced that connects, or can reasonably be inferred to relate, the distances between and/or locations of Lincoln; Fremont; Martin's Access; the Montgomery farm, Cornell, Iowa; the Bredvick farm; Sioux Rapids, Iowa; the Rowe farm; Fridley, Minnesota; the Behun home; St. Paul, Minnesota; the intersection of Como Avenue and Dale Avenue; the secluded area where Billings was driven; Chicago; and Lincoln, to the defendant's contention that he was insane or mentally deranged when he shot and killed McGarry and Brooks. The evidence and arguments made related to what happened at those locales, not to where those locales were in relation to each other or when the defendant was supposed to be there.
>
> . . . .
>
> After reviewing the record, the court finds that there is no reasonable possibility that the extraneous material or information secured by Boyce affected the jury's verdicts to the defendant's detriment. There was no actual prejudice and no reasonable possibility of prejudice to the defendant by Boyce's misconduct.

(Emphasis omitted.)

We disagree with the district court's reasoning that no prejudice occurred because no argument was made or evidence adduced that relates the distances between, and/or locations of, the various places that Williams traveled to his state of mind at

the time of the shootings. Extraneous material viewed by a juror could be prejudicial to a defendant, although the content of the extraneous material was not argued or introduced as evidence at trial. The test to determine whether extraneous material was prejudicial looks to the possible effect of the extraneous material on an average juror's deliberative process. *Loving v. Baker's Supermarkets, supra*; *State v. Owen, supra*. See, also, *U.S. v. Console, supra*; *U.S. v. Boylan, supra*; *U.S. v. Calbas, supra*; *State v. Poh, supra*.

Prior to deliberations, the jurors had not yet been instructed on the applicable law of the case. Jury instructions Nos. 9 and 10 apprised the jurors that it was their duty to determine whether Williams possessed the cognitive abilities at the time of the shootings to understand what he was doing and the nature and quality of his act, to distinguish between right and wrong with respect to it, to know that such act was wrong and deserved punishment, to act intentionally, and to premeditate and deliberate.

A minimum of 14 hours passed after the shootings before Williams left Lincoln. During this time period, Williams visited a friend, slept, sexually assaulted another woman, took LSD, smoked marijuana, and drank beer. People who saw Williams during this time period testified that Williams' demeanor appeared normal.

The evidence adduced at trial established that once on his "flight path," Williams went from Lincoln to St. Paul, Minnesota, to Chicago, Illinois, and then back to Lincoln. More specifically, Williams traveled by car from Lincoln to St. Paul via Fremont, Nebraska; Cherokee City, Iowa; and Cornell, Iowa. Once Williams left St. Paul, he traveled by car to Chicago and then back to Nebraska by train.

Although Boyce was "relatively ignorant of midwest geography at the time of the trial," she did know the relative location of the states to one another, and more specifically knew that Iowa was east of Nebraska and that Minnesota was north of Iowa. Boyce also testified that she knew that Omaha was on the Nebraska-Iowa border in an easterly direction from Lincoln and knew where St. Paul and Chicago were in general terms.

At the trial, Fremont was described as being north of Lincoln; Cherokee City, Iowa, was described as being northeast

of Omaha, Nebraska; Cornell, Iowa, was described as being northeast of Cherokee City, Iowa; and Minnesota was described as being north of Iowa. Thus, without a juror's having looked at the maps, the evidence adduced at trial would have illustrated to the average juror that Williams' initial "flight path," out of Lincoln to St. Paul, was generally in a northeasterly direction.

Williams testified at trial that he used to live in St. Paul. Behun, the man whom Williams kidnapped at gunpoint, was called as a witness by the State and testified on direct examination as follows:

Q. . . . Then just tell us, please, what happened . . . .

A. . . . I assumed that he was just interested in getting the car and taking it and going, and so I proceeded to offer him the keys to the car, but he said — he said, "No. Get in. Take me to St. Paul."

. . . .

Q. All right, sir. And as you then proceeded towards St. Paul, did you receive any directions from the defendant where he wanted to go, what section of town or what have you?

A. Well, he asked me where the Rondo Avenue area was in St. Paul, and I didn't know. I'd heard about it from years ago, but I didn't know where it was.

On cross-examination, the following colloquy occurred between Behun and Williams' counsel:

Q. Now, you again mentioned that you had heard the Rondo area referred to before. Does it to your knowledge or at least did it to your knowledge have a large black population in that area?

A. I really don't remember where it is specifically, but I assume it might have been a somewhat depressed area, yes.

At trial, Williams testified that he was born in Chicago and further testified as follows:

Q. Okay. After you left Lincoln, where did you end up at?

A. Chicago.

Q. And why were you in Chicago?

A. See my mother, I guess, and try to rifle through to see what — you know, what was going on here.

Also introduced into evidence at trial was a tape recording and transcript of an interview that Williams gave to the Lincoln police following his return from Chicago:

[A]. . . . I was just wanting to get somewhere and try to talk to some of my people, tell them what I was doing. Like, I told my mother I was going to turn myself in.

[Q]. You got to see your mother while you were —

[A]. I didn't see her. I just told her I was going to turn myself in.

[Q]. How did you get a hold of your mother?

[A]. By friends. I just told her, you know, she knew all about it. She said that six cops, or something, that came to her house. And she said she didn't want to see me, you know, dead in the streets. So I just told them to tell her that I was going back to turn myself in.

. . . .

[Q]. Did you call your mom on the phone or how did you get a hold of her?

[A]. Oh, I know people, you know, some friends. We kind of relate because she didn't want me to come up there because she said those people didn't want to take any chances about me. And I told her I didn't have any more, any more guns or nothing. And she said that's why they'll probably kill you. So I, I told her that, you know, tell this guy to tell her I was going back to Lincoln and turn myself in.

Williams further testified at trial on direct examination as follows:

Q. . . . And subsequent to your conversation with your mother in Chicago, what did you then do?

A. I started making arrangements to get back here to Lincoln.

Q. Okay. And did you come back to Lincoln?

A. I did.

Q. How did you come back?

A. By means of a freight train.

. . . .

Q. Could you explain how you arranged that?

A. Well, I just — I went out and just found out which train was coming this way and I just got on the boxcar, and I was sick, you know, but I had to get back here.

. . . .

Q. Well, what was your purpose for returning to Lincoln?

A. Well, I figured to get the matter, you know — if it wasn't so, get it cleared up, you know, and if it was so and who I thought it was, you know, still get it cleared up.

. . . .

Q. . . . . Where was the last place you were on a train at in Nebraska?

A. The last place was right here in Waverly.

Q. And from Waverly, where did you go?

A. I came to Lincoln.

Q. Okay. How did you get to Lincoln from Waverly?

A. By means of a truck.

Q. Okay. And where did you get the truck at?

A. National Crane.

Q. Okay. Well, how did you get it?

A. I just — I stole it.

Q. Okay. Did you know who owned the truck?

A. Yeah.

Q. Did you know where the keys were?

A. Yes.

In summary, Williams testified that he used to live in St. Paul, and Behun testified that Williams wanted Behun to take him to a particular area in St. Paul. Williams stated that he went from St. Paul to Chicago so that he could communicate with his mother before turning himself in to the police. Williams further testified that while in Chicago, he arranged to jump on a train that would return him to Nebraska, and then stole a known truck at a familiar location so that he could return to Lincoln.

These facts, and the fact that Williams planned out and committed further crimes in order to continue his journey, were in evidence irrespective of the maps and show that his journey was not random. From this evidence, a reasonable juror could only conclude that Williams took deliberate routes to known locations for intended reasons. Thus, Williams has failed to prove

there exists a reasonable possibility that viewing his "flight path" on extraneous maps could be the bit of information that would lead a reasonable juror to conclude that Williams was legally sane, and formed the requisite mens rea, at the time of the shootings. See, *State v. Anderson*, 252 Neb. 675, 564 N.W.2d 581 (1997); *Loving v. Baker's Supermarkets*, 238 Neb. 727, 472 N.W.2d 695 (1991).

Where the record adequately demonstrates that the decision of a trial court is correct, although such correctness is based on a ground or reason different from that assigned by the trial court, an appellate court will affirm. *State v. Allen*, 252 Neb. 187, 560 N.W.2d 829 (1997); *State v. Anderson*, 245 Neb. 237, 512 N.W.2d 367 (1994).

## V. CONCLUSION

We conclude that the district court did not err in not considering Boyce's testimony or in its finding that Williams was not prejudiced by Boyce's use of the maps. Accordingly, we affirm the district court's denial of Williams' motion for postconviction relief.

AFFIRMED.